No. 26-1258

# In the United States Court of Appeals
## For the Eighth Circuit

STATE OF MISSOURI, *ex rel.* CATHERINE HANAWAY, ATTORNEY GENERAL OF MISSOURI,

*Plaintiff-Appellant,*

v.

STARBUCKS CORPORATION,

*Defendant-Appellee.*

Appeal from the U.S. District Court for the Eastern District of Missouri
(4:25-cv-00165-JAR)

**APPELLANT'S OPENING BRIEF**

**CATHERINE L. HANAWAY**
MISSOURI ATTORNEY GENERAL
Louis J. Capozzi, III, #77756MO
 *Solicitor General*
J. Patrick Sullivan, #42968MO
 *Deputy Solicitor General*
J. Michael Patton, #76490MO
 *Deputy Solicitor General*
815 Olive Street, Ste. #200
St. Louis, Missouri 63101
Tel. (573) 645-9662
Louis.Capozzi@ago.mo.gov

*Counsel for the State of Missouri*

## SUMMARY OF THE CASE

Starbucks's employment policies discriminate against thousands of Missourians. At nearly 200 coffee shops across Missouri, Starbucks establishes racial quotas for its managers and baristas. Starbucks also created mentorship programs for racial minorities, and Starbucks barred its white employees from participating. Finally, Starbucks's "Partner Networks" sort employees based on their race—with a "Black Partner Network," for example. These policies transgress Title VII, 42 U.S.C. § 1981, and the Missouri Human Rights Act ("MHRA").

To protect its citizens, Missouri initiated a *parens patriae* action—invoking its "interest in securing residents from the harmful effects of discrimination." *Alfred L. Snapp & Son v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 609 (1982). In light of this interest, over a dozen courts have permitted States to challenge discrimination within their borders. But here, the District Court brushed aside precedent and dismissed Missouri's complaint. Then, splitting with even more precedents, the court gratuitously held that Missouri lacks statutory authority to enforce Title VII, § 1981, and the MHRA. Because the District Court created several splits of authority, Missouri requests 20 minutes for argument.

ii

Appellate Case: 26-1258    Page: 2    Date Filed: 04/16/2026 Entry ID: 5629454

# TABLE OF CONTENTS

**SUMMARY OF THE CASE**................................................................ii

**TABLE OF CONTENTS**................................................................ iii

**TABLE OF AUTHORITIES**..........................................................v

**JURISDICTIONAL STATEMENT**................................................1

**STATEMENT OF ISSUES**.............................................................2

**INTRODUCTION**..........................................................................3

**STATEMENT OF THE CASE**.......................................................7

I. Starbucks, a prominent company with nearly 200 stores in Missouri, discriminates against employees and applicants based on their race. ...........................................................7

II. Missouri sues Starbucks to end its discriminatory policies and to redress its citizens' past grievances. ......................................15

III. The District Court dismissed Missouri's lawsuit in an order refusing to credit the complaint's factual allegations.................18

**STANDARD OF REVIEW**...........................................................26

**SUMMARY OF THE ARGUMENT**.............................................27

**ARGUMENT**...............................................................................29

I. Missouri has standing to challenge the discriminatory policies of a company with nearly 200 stores and thousands of employees in Missouri. ..................................................................................29

A. States have *parens patriae* standing to challenge a company's facially discriminatory policies.............................29

B. Missouri need not highlight specific Missourians that Starbucks has discriminated against.......................................42

II. The District Court misunderstood text and precedent in holding that Missouri lacks authority to enforce Title VII, Section 1981, and the Missouri Human Rights Act....................44

A. Title VII. ..............................................................................44

Appellate Case: 26-1258   Page: 3   Date Filed: 04/16/2026 Entry ID: 5629454

B. Section 1981. ...........................................................49

C. The Missouri Human Rights Act. .........................................52

III. In dismissing Missouri's complaint for failure to state a claim, the District Court erred by improperly weighing competing evidence and by overlooking applicable law. ..............................54

A. The District Court erroneously weighed competing evidence at the motion-to-dismiss stage. ..............................................54

B. As to Counts 1, 2, and 10, the District Court misjudged text and precedent. .......................................................56

C. As to Counts 6 and 7, the District Court's few sentences of analysis failed to justify Starbucks' Partner Networks. ........63

D. As to Count 3, the District Court ignored statutory text and Missouri Supreme Court precedent. .......................................65

E. As to Counts 4 and 5, the District Court excused Starbucks' mentorship program because of outside evidence that, in any event, does not undermine Missouri's damages claims. ..67

**CONCLUSION** ..................................................................69

iv

# TABLE OF AUTHORITIES

**Cases**

*Adarand Constructors v. Pena,*
515 U.S. 200 (1995) ....................................................................43

*Alfred L. Snapp & Son v. Puerto Rico ex rel. Barez,*
458 U.S. 592 (1982) ..............................................................*passim*

*Am. All. for Equal Rts. v. Fearless Fund Mgmt.,*
103 F.4th 765 (11th Cir. 2024) ...............................................6

*Ames v. Ohio Dep't of Youth Servs.,*
605 U.S. 303 (2025) ...................................................................6

*Aziz v. Trump,*
231 F.Supp.3d 23 (E.D. Va. 2017) ...............................*passim*

*Baker v. Stuart Broad. Co.,*
560 F.2d 389 (8th Cir. 1977) ...................................................47

*Bob Jones Univ. v. United States,*
461 U.S. 574 (1983) ..............................................................49, 52

*C.R. Dep't v. Grimmway Enters.,*
800 F.Supp.3d 1084 (E.D. Cal. 2025) ...........................5, 32, 44

*City of Richmond v. J.A. Croson Co.,*
488 U.S. 469 (1989) ...................................................................48

*Clayton v. White Hall Sch. Dist.,*
875 F.2d 676 (8th Cir. 1989) ...................................................47

*Cole v. Grp. Health Plan,*
105 F.4th 1110 (8th Cir. 2024) ...............................................60

*Domino's Pizza v. McDonald,*
546 U.S. 470 (2006) ...................................................................51

Appellate Case: 26-1258    Page: 5    Date Filed: 04/16/2026 Entry ID: 5629454

*EEOC v. FedEx,*
268 F.Supp.2d 192 (E.D.N.Y. 2003) ....................................5, 32, 44, 45

*Frank v. United Airlines,*
216 F.3d 845 (9th Cir. 2000)..............................................................59

*Georgia v. Pennsylvania R.R. Co.,*
324 U.S. 439 (1945)...........................................................................29

*Gorog v. Best Buy Co.,*
760 F.3d 787 (8th Cir. 2014)..............................................................55

*Grand River Enters. Six Nations v. Beebe,*
574 F.3d 929 (8th Cir. 2009)...........................................26, 54, 65, 68

*Hamilton v. Dallas Cnty.,*
79 F.4th 494 (5th Cir. 2023) (en banc) ..........................................59, 62

*Humphries v. Pulaski Cnty. Special Sch. Dist.,*
580 F.3d 688 (8th Cir. 2009)..........................................................4, 62

*In re New York City Policing During Summer 2020 Demonstrations,*
548 F.Supp.3d 383 (S.D.N.Y. 2021)....................................................50

*Lake v. Yellow Transp.,*
596 F.3d 871 (8th Cir. 2010)..............................................................56

*Lexmark Int'l v. Static Control Components,*
572 U.S. 118 (2014) ..........................................................................48

*Lynch v. Nat'l Prescription Adm'rs,*
787 F.3d 868 (8th Cir. 2015)..............................................................31

*Maitland v. Univ. of Minnesota,*
155 F.3d 1013 (8th Cir. 1998)............................................................62

*Massachusetts v. Bull HN Info. Sys.,*
16 F.Supp.2d 90 (D. Mass. 1998)................................................*passim*

vi

Appellate Case: 26-1258    Page: 6    Date Filed: 04/16/2026 Entry ID: 5629454

*Matthews v. Harley-Davidson,*
685 S.W.3d 360 (Mo. banc 2024) .......................................28, 56, 66, 67

*McDaniel v. Precythe,*
897 F.3d 946 (8th Cir. 2018)...........................................................43

*Missouri ex rel. Bailey v. China,*
90 F.4th 930 (8th Cir. 2024) ...........................................................31

*Muldrow v. City of St. Louis,*
601 U.S. 346 (2024)......................................................28, 57, 60, 62

*New York ex rel. Abrams v. 11 Cornwell Co.,*
695 F.2d 34 (2d Cir. 1982) ....................................................5, 31, 34, 49

*New York ex rel. James v. Griepp,*
991 F.3d 81 (2d Cir. 2021) .......................................................*passim*

*New York ex rel. James v. Niagara-Wheatfield Cent. Sch. Dist.,*
119 F.4th 270 (2d Cir. 2024)..............................................5, 23, 31, 33

*New York ex rel. Schneiderman v. Utica City Sch. Dist.,*
177 F.Supp.3d 739 (N.D.N.Y. 2016)...................................5, 32, 40, 50

*New York ex rel. Vacco v. Mid Hudson Med. Grp., P.C.,*
877 F.Supp. 143 (S.D.N.Y. 1995)..............................................5, 32, 34

*New York v. Peter & John's Pump House,*
914 F.Supp. 809 (N.D.N.Y. 1996)............................................5, 32, 34

*North Dakota v. Heydinger,*
2016 WL 5661926 (D. Minn. Sept. 29, 2016) ....................................49

*Ortiz v. Fibreboard Corp.,*
527 U.S. 815 (1999) .......................................................................41

*Parham v. Sw. Bell Tel. Co.,*
433 F.2d 421 (8th Cir. 1970)...........................................................46

Appellate Case: 26-1258    Page: 7    Date Filed: 04/16/2026 Entry ID: 5629454

*Patrick v. Henderson,*
255 F.3d 914 (8th Cir. 2001) ................................................................. 61

*Pennsylvania v. Flaherty,*
547 F.Supp. 172 (W.D. Pa. 1982) ...................................................... 5, 32

*Pennsylvania v. Glickman,*
370 F.Supp. 724 (W.D. Pa. 1974) ...................................................... 5, 49

*Pennsylvania v. Porter,*
659 F.2d 306 (3d Cir. 1981) (en banc) ...................................... 33, 41, 49

*Piercy v. Maketa,*
480 F.3d 1192 (10th Cir. 2007) ............................................................ 59

*Quinn v. Ocwen Fed. Bank FSB,*
470 F.3d 1240 (8th Cir. 2006) .............................................................. 55

*Sedlacek v. Hach,*
752 F.2d 333 (8th Cir. 1985) ............................................................... 46

*Silver v. H&R Block,*
105 F.3d 394 (8th Cir. 1997) .......................................................... 55, 56

*Support Ministries for Persons with AIDS v. Village of Waterford,*
799 F.Supp. 272 (N.D.N.Y. 1992) ............................................... 5, 32, 34

*Thompson v. N. Am. Stainless,*
562 U.S. 170 (2011) ............................................................................. 48

*Threat v. City of Cleveland,*
6 F.4th 672 (6th Cir. 2021) .................................................................. 59

*Trump v. CASA,*
606 U.S. 831 (2025) ............................................................................. 41

*U.S. ex rel. Kinney v. Stoltz,*
327 F.3d 671 (8th Cir. 2003) ................................................... 26, 53, 55

viii

Appellate Case: 26-1258     Page: 8     Date Filed: 04/16/2026 Entry ID: 5629454

*Ulrich v. Pope Cnty.,*
715 F.3d 1054 (8th Cir. 2013).......................................................26, 55

*Uzuegbunam v. Preczewski,*
592 U.S. 279 (2021).........................................................................68

*Vitolo v. Guzman,*
999 F.3d 353 (6th Cir. 2021)...............................................................4

*Williams v. U.S. Fid. & Guar. Co.,*
236 U.S. 549 (1915)........................................................................45

*Wyatt Bury, LLC v. City of Kansas City,*
804 F.Supp.3d 939 (W.D. Mo. 2025).....................................................39

**Statutes**

15 U.S.C. § 15c..............................................................................38

15 U.S.C. § 2073............................................................................38

15 U.S.C. § 6504............................................................................38

28 U.S.C. § 1291..............................................................................1

28 U.S.C. § 1294..............................................................................1

28 U.S.C. § 1331..............................................................................1

42 U.S.C. § 1981..........................................................3, 27, 51, 58

42 U.S.C. § 1983..........................................................27, 33, 49, 50

42 U.S.C. § 1985.................................................................27, 49

42 U.S.C. § 2000e......................................................27, 44, 45, 46

42 U.S.C. § 2000e-2...................................................................*passim*

ix

42 U.S.C. § 2000e-5.................................................................27, 44, 45, 46

Mo. Rev. Stat. § 213.055.................................................................*passim*

Mo. Rev. Stat. § 213.070.................................................................65, 66

Mo. Rev. Stat. § 213.126.................................................................28, 52

**Other Authorities**

Edward Brunet, *Improving Class Action Efficiency by Expanded Use of Parens Patriae Suits and Intervention,* 74 Tul. L. Rev. 1919 (2000) ...................................................................................................41

F. Andrew Hessick, *Quasi-Sovereign Standing*, 94 Notre Dame L. Rev. 1927 (2019) ...................................................................................50

Hon. Andrea Lucas, *With Supreme Court affirmative action ruling, it's time for companies to take a hard look at their corporate diversity programs*, Reuters (June 29, 2023) ...................................................61

Margaret H. Lemos, *State Enforcement of Federal Law*, 86 N.Y.U. L. Rev. 698 (2011)...........................................................................37, 45

Seth Davis, *Implied Public Rights of Action*, 114 Colum. L. Rev. 1 (2014) ...................................................................................................50

Appellate Case: 26-1258    Page: 10    Date Filed: 04/16/2026 Entry ID: 5629454

# JURISDICTIONAL STATEMENT

This is an appeal from a final judgment entered on February 5, 2026. App.1684, R.Doc.41. The District Court had subject-matter jurisdiction under 28 U.S.C. §§ 1331, 1367. Missouri timely appealed on February 12, 2026. App.1685, R.Doc.44. This Court has appellate jurisdiction under 28 U.S.C. §§ 1291, 1294(1).

1

Appellate Case: 26-1258    Page: 11    Date Filed: 04/16/2026 Entry ID: 5629454

# STATEMENT OF ISSUES

I. **Whether Missouri has standing to challenge Starbucks's policies that facially discriminate based on race.**

- *Alfred L. Snapp & Son v. Puerto Rico ex rel., Barez*, 458 U.S. 592 (1982)

- *New York ex rel. James v. Niagara-Wheatfield Cent. Sch. Dist.*, 119 F.4th 270 (2d Cir. 2024)

- *Adarand Constructors v. Pena*, 515 U.S. 200 (1995)

II. **Whether Missouri holds statutory authority to enforce Title VII, § 1981, and the Missouri Human Rights Act.**

- *Clayton v. White Hall Sch. Dist.*, 875 F.2d 676 (8th Cir. 1989)

- *New York ex rel. James v. Griepp*, 991 F.3d 81 (2d Cir. 2021)

III. **Whether Missouri successfully alleged claims against Starbucks's facially discriminatory policies under Title VII, § 1981, and the Missouri Human Rights Act.**

- *Muldrow v. City of St. Louis*, 601 U.S. 346 (2024)

- *Humphries v. Pulaski Cnty. Special Sch. Dist.*, 580 F.3d 688 (8th Cir. 2009)

- *Matthews v. Harley-Davidson*, 685 S.W.3d 360 (Mo. banc 2024)

Appellate Case: 26-1258    Page: 12    Date Filed: 04/16/2026 Entry ID: 5629454

## INTRODUCTION

Title VII, § 1981, and the Missouri Human Rights Act ("MRHA") prohibit employers from disadvantaging employees based on their race. 42 U.S.C. §§ 1981, 2000e-2; Mo. Rev. Stat. § 213.055. Unfortunately, Starbucks flouts these basic protections in several ways. First, Starbucks sets race-based quotas at all levels of its workforce, including for its district managers, store managers, and baristas. App.23–27, R.Doc.1 ¶¶ 89–113. Second, aside from overall quotas, Starbucks requires the "diversity" of its manager population to grow by a set percentage each year—usually between 1.5–5%. *Id.* ¶¶ 118, 182. Third, to enforce this scheme, Starbucks ties executive compensation to achieving these quotas. *Id.* ¶¶ 114–88. Fourth, Starbucks discriminates against employees by creating mentorship programs available only to minorities. *Id.* ¶¶ 85–86, 189–99. Finally, Starbucks has created "Partner Networks" that separate minority employees based on race and then require representatives from each race to speak on behalf of minority groups to Starbucks's leadership. *Id.* ¶¶ 200–28.

To the extent that a company can ever impose "race-based policies," "it must operate with a scalpel" designed to heal specific cases of

3

Appellate Case: 26-1258     Page: 13     Date Filed: 04/16/2026 Entry ID: 5629454

"intentional discrimination."  *See Vitolo v. Guzman*, 999 F.3d 353, 361 (6th Cir. 2021); *Humphries v. Pulaski Cnty. Special Sch. Dist.*, 580 F.3d 688, 695–96 (8th Cir. 2009).  But rather than functioning like a scalpel, Starbucks's broad policies function like a meat cleaver.  And Starbucks's policies are not intended to remedy past intentional discrimination.

To protect its citizens, Missouri sued Starbucks, seeking prospective relief and damages.  Missouri has a cognizable interest in protecting its residents from "the political, social, and moral damage of discrimination," which "carry a universal sting."  *Alfred L. Snapp & Son v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 609 (1982) (quotation omitted).  "Discrimination of any kind ... corrodes the social fabric and fosters intolerance and inequality.  It is unambiguously in the interest of the state to stop it in its tracks."  *Massachusetts v. Bull HN Info. Sys.*, 16 F.Supp.2d 90, 98 (D. Mass. 1998).

Predictably, Starbucks could not defend its discriminatory policies on their own terms.  Rather, Starbucks moved to dismiss based on erroneous procedural arguments. The District Court granted Starbucks's motion—issuing an order that is abnormal in several ways.

For example, even at the motion-to-dismiss stage, the District

4

Court *sua sponte* ordered Missouri to supplement the record with nearly 1,500 pages of additional exhibits.  App.162, R.Doc.38; App.164–1636, R.Doc.39–R.Doc.39-49.  The District Court then cited those exhibits to discount the allegations in the Missouri's complaint.  *See infra* 18–23.  As another example, the District Court held that States lack a cognizable interest in combatting widespread racial discrimination.  App.1665–66, R.Doc.40 at 29–30.  That holding rejects the views of at least a dozen other courts, who have found that "'securing [a State's] residents from the harmful effects of discrimination'" is a "textbook quasi-sovereign interest[]" supporting State standing.  *Aziz v. Trump*, 231 F.Supp.3d 23, 32 (E.D. Va. 2017) (quoting *Snapp*, 458 U.S. at 609).[1]

---

[1] *Snapp*, 458 U.S. at 609; *New York ex rel. James v. Niagara-Wheatfield Cent. Sch. Dist.*, 119 F.4th 270, 280–81 (2d Cir. 2024); *New York ex rel. Abrams v. 11 Cornwell Co.*, 695 F.2d 34, 38–40 (2d Cir. 1982), *modified on other grounds*, 718 F.2d 22 (2d Cir. 1983); *C.R. Dep't v. Grimmway Enters.*, 800 F.Supp.3d 1084, 1103–04 (E.D. Cal. 2025); *New York ex rel. Schneiderman v. Utica City Sch. Dist.*, 177 F.Supp.3d 739, 747–49 (N.D.N.Y. 2016); *EEOC v. FedEx*, 268 F.Supp.2d 192, 196–98 (E.D.N.Y. 2003); *Bull HN*, 16 F.Supp.2d at 96–98; *New York v. Peter & John's Pump House*, 914 F.Supp. 809, 812 (N.D.N.Y. 1996); *New York ex rel. Vacco v. Mid Hudson Med. Grp., P.C.*, 877 F.Supp. 143, 147 (S.D.N.Y. 1995); *Support Ministries for Persons with AIDS v. Village of Waterford*, 799 F.Supp. 272, 277 (N.D.N.Y. 1992); *Pennsylvania v. Flaherty*, 547 F.Supp. 172, 174 (W.D. Pa. 1982); *Pennsylvania v. Glickman*, 370 F.Supp. 724, 728 (W.D. Pa. 1974).

Appellate Case: 26-1258     Page: 15     Date Filed: 04/16/2026 Entry ID: 5629454

The District Court also appeared indifferent to the basic protections of Title VII, § 1981, and the MHRA. The court claimed that Missouri is "advanc[ing] the interests of a select group of private citizens, no different or more righteous than the allegedly discriminatory employment policies [Missouri] seeks to defeat." App.1665, R.Doc.40 at 29. But that is nonsense. Missouri demands that Starbucks treat all people equally. And Title VII, § 1981, and the MHRA "establish[] the same protections for every 'individual'—without regard to that individual's membership in a minority or majority group." *Ames v. Ohio Dep't of Youth Servs.*, 605 U.S. 303, 310 (2025). The District Court's approach "forget[s]" discrimination's impact on "real-live, flesh-and-blood individuals" whom Starbucks disadvantages "*solely on account of the color of their skin.*" *Am. All. for Equal Rts. v. Fearless Fund Mgmt.*, 103 F.4th 765, 774 (11th Cir. 2024) (emphasis original).

Altogether, the District Court's order—if accepted—would cripple the ability of States to prevent widespread discrimination within their borders. This Court should reverse and remand for further proceedings.

6

Appellate Case: 26-1258     Page: 16     Date Filed: 04/16/2026 Entry ID: 5629454

I. **Starbucks, a prominent company with nearly 200 stores in Missouri, discriminates against employees and applicants based on their race.**

Starbucks is a worldwide coffee company that has about 211,000 employees across the United States. App.20, R.Doc.1 ¶ 72. In Missouri, Starbucks has nearly 200 stores and employs "hundreds, if not thousands, of Missourians." *Id.* ¶¶ 46–47. Starbucks also "receives employment applications from hundreds more" Missourians. *Id.* ¶ 47. Shortly before Missouri filed its complaint, Starbucks had "234 job openings in Missouri, ranging from barista to store manager to district manager." *Id.* ¶ 51. Starbucks also "offers nationwide jobs that are '100% remote' and thus can be filled by residents of Missouri." *Id.* ¶ 52.

Unfortunately, Starbucks awards many of these positions based on race. *Id.* ¶¶ 89–188. Also, even when Starbucks hires a disfavored applicant, it continues to discriminate through its exclusive mentorship programs and "Partner Networks." *Id.* ¶¶ 85–86, 189–228. These "policies harm the many Missourians whom work, or would like to work, at Starbucks, but have been, are being, or will be discriminated against as future victims on the basis of their race." *Id.* ¶¶ 50, 53, 55–56.

Starbucks implements these discriminatory harms to Missourians

Appellate Case: 26-1258    Page: 17    Date Filed: 04/16/2026 Entry ID: 5629454

under the guise of equity and inclusion. *Id.* ¶¶ 84–100. In its own words, Starbucks intends to "advance equity in hiring and promotions by developing frameworks, tools, and processes to ensure that diversity goals are woven into business decisions; identifying new programs and initiatives to bolster diversity within the company; and measuring the impact of diversity strategies and programs." *Id.* ¶¶ 95, 100. Starbucks's aspirations manifest themselves in five discriminatory policies relevant to this appeal:

1. First, Starbucks sets quotas for its corporate employees, managers, baristas, and manufacturers. Starbucks's quotas focus especially on increasing the percentage of employees who are "Black, Indigenous, [or] People of Color" ("BIPOC"). *Id.* ¶ 87. For example, in October 2020, Starbucks committed to "[s]etting and tracking annual inclusion and diversity goals of achieving BIPOC representation of at least 30 percent at all corporate levels and at least 40 percent of all retail and manufacturing roles by 2025." *Id.* ¶¶ 85, 89. Starbucks then released a slew of new quotas in 2021 as part of its broader goal of "achieving BIPOC representation." *Id.* ¶ 102. These "goals" include express racial quotas. One quota is to have "[a]t least 40% BIPOC

8

representation … in all retail roles, by 2025 in the U.S." *Id.* ¶ 104. Another quota includes having "[a]t least 30% BIPOC representation … for all enterprise roles, including senior leadership, by 2025 in the U.S." *Id.* ¶ 105. A third quota is to have "[a]t least 40% BIPOC representation … in all manufacturing roles by 2025 in the U.S." *Id.* ¶ 106.

In 2023, Starbucks watered down its language by describing its efforts as merely "aspirational." *Id.* ¶ 110. But Missouri's complaint alleges that "this language is mere pretext" and that "Starbucks's percentages are not mere aspirational goals." *Id.* ¶¶ 111–13.

**2.** Second, aside from its overall quotas, Starbucks requires regular growth in the percentage of its diverse managers. In 2021, Starbucks established a "representation target" that aimed for "improvement in [BIPOC] representation at the manager level and above, with a 3-year target of improving [BIPOC] representation by more than 5% by 2023." *Id.* ¶ 118. More recently, Starbucks aimed for "improvement in U.S. people of color representation at the manager level and above by 1.5 percentage points or more by fiscal year 2026." *Id.* ¶ 182. Starbucks has not claimed that these targets of 1.5 to 5% are designed to remedy past discrimination.

9

Appellate Case: 26-1258    Page: 19    Date Filed: 04/16/2026 Entry ID: 5629454

**3.** Third, to achieve its quotas for increased diversity, Starbucks ties executive compensation to whether its affirmative action policies succeed. *Id.* ¶ 169. "Starbucks has distributed written training materials, shareholder documents, public reports, or other written statements, including emails and internal memoranda, that state that Starbucks ties executive compensation to the executive's ability to meet the quotas." *Id.* Starting in FY2021, Starbucks said it would do this by "tying" its executives' bonuses and awards of performance-based restricted stock units ("PRSUs") to "the building of inclusive and diverse teams" and other "diversity goals." *Id.* ¶ 123–26.

Under this scheme, "[e]xecutives who meet the quota get a carrot: an increased bonus." *Id.* ¶ 128. Executives who do not suffer a penalty: "a deceased bonus, if one is even awarded." *Id.* ¶ 129. All "of Starbucks executives had compensation tied to the building of inclusive and diverse teams." *Id.* ¶ 132 (cleaned up). Executives receive a performance bonus and stock options if they meet the racial quotas. *Id.* ¶¶ 115–45. But their bonuses are decreased if they do not. *Id.*

Starbucks has reinstituted versions of this policy since FY2021. *See id.* ¶¶ 131, 133. In FY2024, Starbucks tried to better hide this scheme

10

Appellate Case: 26-1258    Page: 20    Date Filed: 04/16/2026 Entry ID: 5629454

by, for example, changing its terminology such as "representation modifier" to "talent modifier." *See id.* ¶ 178; *id.* ¶¶ 172–88. But make no mistake: Starbucks again instituted a policy tying executive compensation to achieving racial quotas. *Id.* Also, days before Missouri filed its complaint, Starbucks reiterated that it still uses its "talent modifier" to "hold[] [its] senior leaders collectively accountable for meeting a three-year talent goal for the fiscal year 2024 PRSUs, which focuses on improvement in U.S. people of color representation at the manager level and above by 1.5 percentage points or more by fiscal year 2026." *Id.* ¶ 182.

There's more. To achieve its quotas, Starbucks also ties bonuses to its executives' ability to retain BIPOC employees. Starbucks requires all its executives "to participate in Starbucks's mentorship program." *Id.* ¶ 147. And within that mentorship program, Starbucks includes a quota system measuring each executive's ability to retain BIPOC individuals as Starbucks employees. *Id.* ¶ 149. If an executive's "BIPOC Retention Rate" is below 90%, they lose half their bonus. *Id.* ¶¶ 150–51. Meanwhile, an executive who obtains a BIPOC retention rate of greater than 98% receives twice their bonus. *Id.* ¶ 152.

11

\* \* \*

Again, "Missouri incorporate[d] into each allegation" of its Complaint that some victims of this discriminatory scheme "resided or worked for Starbucks in Missouri." *Id.* ¶¶ 50, 53–55. Indeed, Starbucks imposes these quotas for its employees "in the U.S."—of which Missouri is a part. *See id.* ¶¶ 104–06, 182.

Moreover, although Missouri could not obtain state-specific statistics without discovery, Starbucks has published nationwide statistics showing that its race-based policies are having an effect on the company's American workforce overall. *See id.* ¶¶ 163–67. For example, in 2021, 53.5% of Starbucks's U.S. employees were white. *Id.* ¶ 107 (citing App.625, R.Doc.39-23 at 16); *see also id.* ¶ 103. But by 2024, Starbucks decreased its percentage of white employees to 47.8%—a difference of nearly 5 percentage points. *Id.* ¶ 163.

**4.** Fourth, even when Starbucks hires disfavored applicants, it continues to discriminate against them as employees. One stark example is Starbucks's mentorship program. Starbucks created this mentorship program to retain BIPOC employees so that Starbucks could meet its diversity quotas. *Id.* ¶¶ 85–86, 147–52, 189–93.

12

To that end, Starbucks opened mentorship opportunities only for racial minorities. *Id.* ¶¶ 148, 189–93. Starbucks launched this program for the express purpose of "connecting BIPOC partners[2] to senior leaders and investing in strategic partnerships with professional organizations that focus on the development of BIPOC talent." *Id.* ¶ 86 (cleaned up). Starbucks officials as high as "senior vice presidents and above" have participated in this program. *Id.* ¶ 190. They provide mentees with extraordinary opportunities including "one-on-one sessions between mentors and mentees, mentorship circles with a 1:3 mentor-mentee ratio, and community events." *Id.* ¶ 191. Starbucks has denied white employees these same opportunities. *Id.* ¶ 193.

Also, to ensure that its executives participate, Starbucks conditioned part its executives' compensation on active involvement in the mentorship program. For example, Starbucks's executives cannot obtain bonuses for achieving racial quotas unless they also participate in Starbucks's mentorship program. *Id.* ¶ 147. Additionally, even executives who participate in the mentorship program will not receive a

---

[2] Starbucks refers to its employees as "partners." *Why we call our employees "partners,"* https://about.starbucks.com/beanstock/ (accessed April 13, 2026).

Appellate Case: 26-1258     Page: 23     Date Filed: 04/16/2026 Entry ID: 5629454

payout unless they score well on Starbucks's "Inclusive Leadership Survey." *Id.* ¶ 153. Under this Survey, executives are scored on a scale of 1–5. *Id.* ¶ 154. If an executive's score falls between a 2 to 2.5, their bonus will decrease. *Id.* ¶ 155. But if their score surpasses a 4.5, their bonus will double. *Id.* ¶ 157.

**5.** Finally, Starbucks has established "Partner Networks" that sort employees based on their race. Starbucks characterizes these networks as "partner-led groups that bring together people with shared identities and experiences, along with allies." *Id.* ¶ 201. For example, Starbucks has a "Black Partner Network," an "Indigenous Network," a "Pan-Asian Partner Network," and so on. *Id.* ¶¶ 203–07. Starbucks has no Partner Network for white employees. *Id.* ¶ 220.

These networks are significant for two reasons. First, they serve as liaisons between Starbucks's leadership and its rank-and-file employees. *Id.* ¶ 213. For example, starting in May 2020, Starbucks's CEO began hosting "quarterly roundtables with leaders of the Partner Networks." *Id.* ¶ 211. Second, Starbucks provides targeted training for advancement to employees who belong to these Partner Networks. *Id.* ¶ 214.

In 2024, concerned shareholders submitted a proposal to "conduct

14

an audit and report to determine if and to what extent [Starbucks's] programs and practices direct systemic discrimination against groups or types of employees, including 'non-diverse' employees." *Id.* ¶ 216. This would have included "a review of the Partner Networks" with a report to be "publicly disclosed on [Starbucks's] website." *Id.* ¶¶ 217–18. As the shareholder proposal noted, "[m]embership in [partner network] groups is often based on surface-level characteristics such as race." *Id.* ¶ 219.

However, Starbucks's board of directors "recommend[ed] that shareholders vote AGAINST this proposal." *Id.* ¶ 223. The board also claimed that "Partners of represented and underrepresented groups are not only allowed but encouraged to participate fully" in Partner Networks. *Id.* ¶ 224. Yet the complaint alleges that this was "merely pretext to cover up [Starbucks's] unlawfully discriminatory intentions." *Id.* ¶ 226. Because Starbucks's shareholders voted against an audit of the Partner Networks, *id.* ¶ 228, they still operate today.

## II. Missouri sues Starbucks to end its discriminatory policies and to redress its citizens' past grievances.

In 2025, the Missouri Attorney General resolved to end Starbucks's discriminatory policies in Missouri. All the policies discussed above discriminate against thousands of Missourians seeking or holding

15

employment at Starbucks. *Id.* ¶¶ 46–48, 50–56. Thus, Missouri launched a *parens patriae* action to enforce Title VII, § 1981, and the MHRA.

Missouri alleged ten counts in its complaint, eight of which are relevant to this appeal.[3] Counts 1 and 2 confront Starbucks's affirmative action quotas and enforcement scheme, which enshrine discriminatory hiring and employment practices in violation of Title VII and the MHRA. *Id.* ¶¶ 268–93. Count 10 also challenges Starbucks's affirmative action scheme under 42 U.S.C. § 1981. *Id.* ¶¶ 328–36. Next, Count 3 alleges that Starbucks, as an "employer," is "attempt[ing]" to "incite" or "compel" the commission of discriminatory activities in violation of the MHRA. *Id.* ¶¶ 294–301. Counts 4 and 5 then challenge Starbucks's racially exclusive mentorship program under Title VII and the MHRA because the mentorship program "discriminate[s]" against employees in a "program established to provide apprenticeship." *Id.* ¶¶ 302–11. Finally, Counts 6 and 7 allege, under Title VII and the MHRA, that Starbucks's Partner Networks unlawfully classify employees in a way that "tend[s] to deprive … individual[s] of employment opportunities." *Id.* ¶¶ 312–19.

---

[3] Missouri does not appeal the dismissal of counts 8 and 9.

16

Importantly, Missouri sought injunctive relief, declaratory relief, *and* retrospective relief. *Id.* at 57–58. Of course, the retrospective relief is designed to hold Starbucks accountable for past discrimination—even if Starbucks voluntarily changes its policy moving forward. To that end, Missouri seeks damages, "including but not limited to, compensatory damages, … punitive damages, and nominal damages." *Id.* at 58.

In response, Starbucks moved to dismiss. First, Starbucks argued that Missouri courts lack personal jurisdiction. App.87–89, R.Doc. 17 at 4–6. Second, Starbucks argued that Missouri lacks Article III standing because Missouri supposedly has no cognizable interest in protecting its citizens from race-based employment discrimination. *Id.* at 6–8. Third, Starbucks argued that Missouri lacks statutory authority to enforce Title VII, § 1981, and the MHRA. *Id.* at 8–12. Finally, Starbucks argued that Missouri's 336-paragaph complaint fails to state a claim. *Id.* at 12–15.

Even at the motion-to-dismiss stage, Starbucks improperly contested many facts alleged in Missouri's complaint. *See, e.g., id.* at 1–4, 14; App.146, R.Doc.35 at 2 n.1. Yet, even in this misguided effort, Starbucks also conceded many allegations in Missouri's complaint. For example, without citation and in direct contravention of the complaint's

17

Appellate Case: 26-1258    Page: 27    Date Filed: 04/16/2026 Entry ID: 5629454

allegations, Starbucks argued that its "Bonus Plan has never been linked to Starbucks's aspirational representation goals." App.85, R.Doc.17 at 2 n.3. But then Starbucks later admitted that its bonus plan was tied to its "BIPOC retention rate," which was a metric imposed in service of Starbucks's quota. *Id.* at 2–3 n.3. Likewise, Starbucks conceded that it tied executive compensation to achieving Starbucks's quotas—including stock units with modifiers "based on" achieving a "U.S. increase in minority representation in management over the vesting period." *Id.* at 3. Starbucks also cited evidence from *outside the complaint* to support its claim that, in 2023, Starbucks opened its mentorship programs to white employees. *Id.* at 14 n.8. But Starbucks also conceded that, before 2023, the "mentorship program" was for "BIPOC" employees alone. *Id.* Starbucks never explained why Missouri's damages claims should be dismissed even assuming the truth of the newly introduced evidence.

### III. The District Court dismissed Missouri's lawsuit in an order refusing to credit the complaint's factual allegations.

The District Court granted Starbucks's motion to dismiss. Even at the motion-to-dismiss stage, the District Court extensively considered outside evidence and credited Starbucks's attempt to dispute facts alleged in the complaint.

18

Four months after the parties completed briefing, the District Court *sua sponte* ordered Missouri to submit exhibits of every document cited in its complaint—about 1,500 pages of material. App.162, R.Doc.38. The District Court claimed that this was necessary because Starbucks made arguments about "the contents of these documents," yet Starbucks had deactivated many of the website links that Missouri cited in its complaint. *Id.* Two weeks later, Missouri submitted 49 exhibits in light of the District Court's order. App.164–1636, R.Doc.39–R.Doc.39-49. Then, on February 5, 2026, the District Court dismissed Missouri's complaint. App.1684, R.Doc.41. The court's order delved into the forty-nine exhibits and the court took judicial notice of documents that are not cited in Missouri's complaint. *See, e.g.*, App.1639–45, 1651, R.Doc.40 at 3–9, 4 n.7, 15. The court did not hold a hearing on the motion to dismiss, nor did it afford Missouri an opportunity for briefing or a hearing about Starbucks's evidentiary disputes.

The District Court's order proceeded in five main parts: First, the court provided a background section that effectively made factual findings at the motion-to-dismiss stage. *Id.* at 1–15. Second, the court rejected Starbucks's objection to personal jurisdiction. *Id.* at 18–23.

19

Appellate Case: 26-1258    Page: 29    Date Filed: 04/16/2026 Entry ID: 5629454

Third, it dismissed Missouri's complaint for lack of Article III standing. *Id.* at 23–33. Fourth, despite the jurisdictional dismissal, the court gratuitously held that Missouri lacks statutory authority to enforce Title VII, § 1981, and the MHRA. *Id.* at 33–37. Fifth, despite the two previous dismissals, the court also held that Missouri failed to allege facts showing that Starbucks violated the statutes at issue. *Id.* at 37–46.

In the "background" section, the District Court started by describing Starbucks's mentorship program. The court acknowledged that the complaint "alleged that 'minority employees' were allowed to participate in this mentorship program while employees 'of other races or other sexes' were not." *Id.* at 3. But then, the court credited Starbucks's claim that "the program was later expanded to make participation available to all of Defendant's employees" in 2023. *Id.* at 3–4. Because this claim is not supported by the complaint, the District Court took "judicial notice" of a Starbucks fiscal report. *Id.* at 4 n.7. The court did not explain how an alleged policy change in 2023 could eliminate Missouri's retrospective challenges to conduct *before* the change.

Next, the District Court discussed Starbucks's "Partner Networks,"

20

and it echoed Starbucks's factual claim that these "affinity groups" are "open to all of Defendant's employees." *Id.* at 4. The court credited Starbucks's factual claim even while acknowledging Missouri's point that this factual claim "does not appear in the Complaint or attached exhibits." *Id.* at 4 n.10. To get around Missouri's point, the court cited two exhibits that were *not* attached to the complaint—yet were filed in October 2025 because of the court's order for additional evidence. *Id.* (citing App.454, R.Doc.39-19 at 103; App.1527, R.Doc.39-46 at 2). Remarkably, the court never acknowledged the complaint's allegation that Starbucks's statements in these exhibits are "merely pretext to cover up its unlawfully discriminatory intentions." *Compare* App.47, R.Doc.1 ¶¶ 224, 226, *with* App.1640, R.Doc.40 at 4 n.10. Instead, the court simply credited Starbucks's claims over the complaint's allegations.

Lastly, as to Starbucks's affirmative-action scheme, the District Court acknowledged Missouri's allegation that Starbucks adopted "quotas tied to executive compensation to ensure they were achieved." App.1642–47, R.Doc.40 at 6–11. But the court emphasized (as if it were a good thing) that "just before [Starbucks's] new goal was announced, Defendant reported that its total workforce was *already* comprised" of

21

enough BIPOC employees to satisfy its quota. *Id.* at 6 (emphasis original). The court later acknowledged though that Starbucks had tracked "BIPOC retention rate[s]" to aid in maintaining this quota. *Id.* at 7–8. The court also acknowledged that—in addition to its overall quota—Starbucks aimed for "improvement in U.S. people of color representation at the manager level and above by 1.5 percentage points or more by fiscal year 2026." *Id.* at 9. However, after acknowledging these points, the court again cited extraneous evidence that Starbucks may be adjusting this scheme moving forward, though whether the new scheme will include race-based diversity targets is unclear. *Id.* at 9 n.25 (citing App.1274, R.Doc.39-33 at 70).

Finally, reading the complaint in the light most favorable to Starbucks, the court concluded—in the background section—that Missouri's 336-paragraph complaint failed to allege that this affirmative-action scheme discriminated against Missourians. *Id.* at 10. For example, although the complaint alleges that Starbucks's quotas apply throughout "the U.S.," App.26, 39–40, R.Doc.1 ¶¶ 104–06, 182, the District Court claimed that Missouri's complaint "does not" specify "whether the alleged hiring quotas applied to Defendant's Missouri

22

locations," App.1646, R.Doc.40 at 10. Similarly, the court faulted Missouri's complaint for not "specify[ing] whether there was any meaningful demographic change in Missouri," *id.*—even though Missouri never had a chance to pursue discovery. The court also never addressed Missouri's allegations that victims of this discrimination "resided or worked for Starbucks in Missouri." App.16–17, R.Doc.1 ¶¶ 50, 53–55.

After disagreeing with the complaint's allegations, the District Court analyzed Starbucks's legal arguments. It correctly rejected Starbucks's challenge to the court's personal jurisdiction. App.1654–59, R.Doc.40 at 18–23. But then, it dismissed Missouri's complaint, claiming that Missouri lacks *parens patriae* standing to confront Starbucks's discriminatory policies. The District Court did so by narrowly interpreting the Supreme Court's *Snapp* decision, and by disagreeing with the Second Circuit's opinion in *New York ex rel. James v. Niagara-Wheatfield Central School District*, 119 F.4th 270 (2d Cir. 2024). App.1660–69, R.Doc.40 at 24–33.

Next, despite its jurisdictional holding, the District Court issued two alternative holdings on the merits. First, it held that the Missouri lacks authority to enforce Title VII, § 1981, and the MHRA. *Id.* at 33–37.

23

The court reasoned that Missouri cannot enforce Title VII because it is not "aggrieved" by widespread racial discrimination within Missouri. *Id.* at 33–35. Next, the court held that Missouri cannot enforce § 1981 because Missouri supposedly is not vindicating its "*own* interests." *Id.* at 35–36. Then, the court held that the Missouri lacks authority to enforce the MHRA because the complaint supposedly never alleged that Starbucks's policies "harm" Missourians. *Id.* at 36–37.

Second, despite its two previous alternative holdings, the District Court reached out to hold that Missouri failed to state a claim. *Id.* at 37–45. The court dismissed counts 1, 2, and 10 because Missouri supposedly never alleged "any specific" "adverse actions" against Missourians under Starbucks's affirmative-action policy. *Id.* at 37–42. Next, the District Court dismissed counts 6 and 7 in two sentences.[4] *Id.* at 42. The District Court merely said—despite Missouri's directly contrary factual allegations—that dismissal was appropriate because the "Partner Networks" are "plainly not groups that segregate or classify employees to

_____

[4] The District Court's reference to "Counts 4 and 5" in one of these sentences appears to be a scrivener's error. App.1678, R.Doc.40 at 42. This section otherwise discusses Counts 6 and 7, *id.* 37–38, 42, and the court separately analyzes Counts 4 and 5 later in the order, *id.* at 44–45.

24

their detriment" and "are open to all employees." *Id.* Next, the District Court dismissed count 3 merely on the theory that Starbucks cannot incite or compel its own employees to discriminate against others. *Id.* at 43. Finally, the District Court dismissed counts 4 and 5 because—according the Starbucks's version of the facts—Starbucks's mentorship programs are "now open to all employees." *Id.* at 44. Again, the District Court never explained why Starbucks's changed policy justified dismissal of Missouri's claims for retrospective relief—including compensatory and nominal damages. *Id.*

Missouri timely appealed.

Appellate Case: 26-1258    Page: 35    Date Filed: 04/16/2026 Entry ID: 5629454

## STANDARD OF REVIEW

This Court reviews "a grant of a motion to dismiss under a de novo standard of review." *Grand River Enters. Six Nations v. Beebe*, 574 F.3d 929, 935 (8th Cir. 2009). The Court must assume the truth of "all factual allegations in the complaint," *id.*, and it construes the complaint's allegations in the light most favorable to the plaintiff, *U.S. ex rel. Kinney v. Stoltz*, 327 F.3d 671, 674 (8th Cir. 2003). "[A]ll reasonable inferences from the complaint must be drawn in favor of [the plaintiff] as the source of all relevant allegations in the current action." *Id.* Further, "[d]ismissal is inappropriate unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Ulrich v. Pope Cnty.*, 715 F.3d 1054, 1058 (8th Cir. 2013) (quotation omitted).

Appellate Case: 26-1258   Page: 36   Date Filed: 04/16/2026 Entry ID: 5629454

The District Court's order depended on construing the complaint's allegations in the light most favorable to Starbucks, not Missouri. The court failed to draw all reasonable inferences in Missouri's favor. Instead, it relied on facts outside the complaint to justify its dismissal.

The District Court's legal conclusions also conflict with precedent. *First*, the District Court claimed that Missouri lacks Article III standing to protect its citizens from widespread discriminatory policies. However, this conflicts with *Snapp* and a dozen other cases holding that "'securing [a State's] residents from the harmful effects of discrimination'" is a "textbook quasi-sovereign interest[]" supporting *parens patriae* standing. *Aziz*, 231 F.Supp.3d at 32 (quoting *Snapp*, 458 U.S. at 609); *supra* n.1.

*Second*, the District Court erred by holding that Missouri lacks authority to enforce Title VII, § 1981, and the MHRA. Title VII's text clearly authorizes *parens patriae* suits by States. *See* 42 U.S.C. §§ 2000e(a), 2000e-5. Courts have also approved of many *parens patriae* suits under Title VII, §§ 1981, 1983, 1985, and other civil rights statutes. Finally, the MHRA authorizes Missouri's "attorney general" to initiate enforcement "[w]henever [she] has a reasonable cause to believe that any

27

person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights granted by [the MHRA]." Mo. Rev. Stat. § 213.126(1).

*Third*, the District Court erred by holding that Missouri failed plausibly allege facts supporting a claim for relief. Much of the District Court's reasoning simply disagrees with the facts alleged in Missouri's complaint. This was inappropriate at the motion-to-dismiss stage. Also, even crediting the District Court's version of the facts, the court erred repeatedly on the law. The District Court's holdings depend on critical misunderstandings precedents such as *Muldrow v. City of St. Louis*, 601 U.S. 346 (2024), and *Matthews v. Harley-Davidson*, 685 S.W.3d 360 (Mo. banc 2024). Once those misinterpretations are corrected, the need for reversal is clear.

Appellate Case: 26-1258    Page: 38    Date Filed: 04/16/2026 Entry ID: 5629454

<u>**ARGUMENT**</u>

**I. Missouri has standing to challenge the discriminatory policies of a company with nearly 200 stores and thousands of employees in Missouri.**

**A. States have *parens patriae* standing to challenge a company's facially discriminatory policies.**

The District Court wrongly concluded that Missouri lacks *parens patriae* standing to prevent Starbucks from discriminating against applicants and employees across the State. "Suits by a State, parens patriae, have long been recognized." *Georgia v. Pennsylvania R.R. Co.*, 324 U.S. 439, 447 (1945). And at least since *Snapp*, the Supreme Court has recognized that States can sue *parens patriae* to "secur[e] residents from the harmful effects of discrimination." 458 U.S. at 609. This establishes Missouri's standing here.

*Snapp* explained that a State can maintain a *parens patriae* action if the State expresses "a quasi-sovereign interest" that is "apart from the interests of particular private parties, *i.e.*, the State must be more than a nominal party." *Id.* at 607. Among other potential bases for standing, *Snapp* acknowledged that "a State has a quasi-sovereign interest in the health and well-being—both physical and economic—of its residents in general." *Id.* For that theory of standing, the Court admitted that it had

29

Appellate Case: 26-1258     Page: 39     Date Filed: 04/16/2026 Entry ID: 5629454

not "attempted to draw any definitive limits on the proportion of the population of the State that must be adversely affected by the challenged behavior." *Id.* The Court continued that, "[a]lthough more must be alleged than injury to an identifiable group of individual residents, the indirect effects of the injury must be considered as well in determining whether the State has alleged injury to a sufficiently substantial segment of its population." *Id.*

Under these standards, *Snapp* held that Puerto Rico had standing to sue private employers who discriminated against Puerto Rican workers because of their ethnicity. In the process, the Court explicitly recognized a State's quasi-sovereign interest in "securing residents from the harmful effects of discrimination"—noting that courts have "had too much experience with the political, social, and moral damage of discrimination not to recognize that a State has a substantial interest in assuring its residents that it will act to protect them from these evils." *Id.* at 609. The Court also rejected the employers' argument that Puerto Rico lacked *parens patriae* standing because there were "only 787 job opportunities at stake" in the case. *Id.* The Court held that the "universal sting" of discrimination affected all Puerto Ricans even though

30

only a few hundred were victims of discrimination. *Id.*

*Snapp* is the Supreme Court's last decision outlining the boundaries of the *parens patriae* doctrine. Missouri is also unaware of any precedent from this Court that deals with *parens patriae* standing to challenge an employer's discriminatory policies. That said, this Court recently approved of Missouri's *parens patriae* standing to sue China "based on the harms Missourians suffered" because of China's role hindering "safe and effective treatment of patients with the virus." *Missouri ex rel. Bailey v. China*, 90 F.4th 930, 939 n.2 (8th Cir. 2024) (cleaned up); *see also Lynch v. Nat'l Prescription Adm'rs*, 787 F.3d 868, 872 (8th Cir. 2015) (The *parens patriae* doctrine "permits the state to commence an action to protect a public interest, like the safety, health or welfare of its citizens." (quotation omitted)).

Outside this Circuit, many courts—relying on *Snapp*—have recognized a State's *parens patriae* standing to challenge discriminatory policies and practices. *See Niagara-Wheatfield*, 119 F.4th at 280–82 (*parens patriae* standing to challenge Title IX violations); *Cornwell*, 695 F.2d at 38–40 (finding *parens patriae* standing because the State had "no less an interest in seeing to it that its mentally retarded obtain equal

31

protection under the housing laws than Puerto Rico has in seeing that its citizens obtain equal employment opportunities"); *Grimmway*, 800 F.Supp.3d at 1103 (recognizing California's "interest in addressing alleged disability-based unlawful employment practices occurring within [its] borders"); *Utica*, 177 F.Supp.3d at 748 (*parens patriae* standing to "eradicat[e] discrimination in educational opportunities"); *FedEx*, 268 F.Supp.2d at 196–99 (*parens patriae* standing to enforce Title VII); *Bull HN*, 16 F.Supp.2d at 98 (*parens patriae* standing to oppose age discrimination and noting "[t]he circumstances of this case are similar to those in *Snapp*"); *Peter & John's*, 914 F.Supp. at 813 (*parens patriae* standing to sue a racially-exclusive nightclub because "discrimination that has a destructive societal effect justifying *parens patriae* standing"); *Mid Hudson*, 877 F.Supp. at 147 (*parens patriae* standing to protect deaf citizens from discrimination); *Waterford*, 799 F.Supp. at 277–79 (*parens patriae* standing to prevent housing discrimination against persons with AIDS); *Flaherty*, 547 F.Supp. at 174 (*parens patriae* standing to challenge discriminatory hiring by a police department); *see also New York ex rel. James v. Griepp*, 991 F.3d 81, 129 (2d Cir. 2021) ("[A] state would naturally have a quasi-sovereign interest in preventing any interference

32

Appellate Case: 26-1258     Page: 42     Date Filed: 04/16/2026 Entry ID: 5629454

with patients' access to reproductive health care facilities resulting from protests."), *modified on other grounds*, 11 F.4th 174 (2d Cir. 2021); *Pennsylvania v. Porter*, 659 F.2d 306, 314–19 (3d Cir. 1981) (en banc) (*parens patriae* permitted under § 1983).

At the same time, Missouri acknowledges that States might not have standing to challenge *all types* of discriminatory action. After all, *Snapp* recognized that States cannot obtain standing by serving as merely nominal parties in a case. 458 U.S. at 607. For example, if an employer discriminates against a single individual, a State might not have standing. *But see Niagara-Wheatfield*, 119 F.4th at 280–81 n.4. Such discrimination is likely individualized and optimally addressed through an individual lawsuit—in which the State would be just a nominal party. By contrast, *Snapp* and other federal precedents make clear that States do have standing to challenge *widespread* discriminatory policies—which are more plausibly understood as injuries to the State and not just a few private individuals. *Snapp*, 458 U.S. at 609; *Aziz*, 231 F.Supp.3d at 32; *Bull HN*, 16 F.Supp.2d at 98–101.

Missouri also acknowledges that the line between individualized discrimination—which a State lacks standing to challenge—and

33

widespread discrimination, which a State has standing to challenge under *Snapp*, will not always be clear.  *Snapp* itself acknowledged that point.  458 U.S. at 607.  But courts have consistently found state standing in cases involving even very limited discrimination.  In *Griepp*, the Second Circuit found *parens patriae* standing to sue protestors outside *one* abortion facility because protestors allegedly "harass[ed]" staff, patients, and their companions—who were a "substantial segment" of the State's population.  991 F.3d at 131–32.  Similarly, in *Aziz*, the court held that Virginia had *parens patriae* standing to protect even *non-citizen* residents from discrimination—about 300 of whom were "directly affected" and the whole state indirectly effected because "the stigma of discrimination 'carr[ies] a universal sting.'"  231 F.Supp.3d at 32 (alteration original) (quoting *Snapp*, 458 U.S. at 609).  Other similar examples abound.  *See Cornwell*, 695 F.2d at 39–40 (discrimination against 8–10 mentally disabled persons); *Bull HN*, 16 F.Supp.2d at 98–101 (discrimination against about 50 employees); *Peter & John's*, 914 F.Supp. at 812 (discrimination against 8 African-American patrons); *Mid Hudson*, 877 F.Supp. at 147–48 (discrimination against 7–10 hearing-impaired patients); *Waterford*, 799 F.Supp. at 277 (discrimination

34

Appellate Case: 26-1258     Page: 44     Date Filed: 04/16/2026 Entry ID: 5629454

against 15 persons with AIDS).

The Second Circuit's decision in *Niagara-Wheatfield* is illustrative. There, the Second Circuit found an injury to a substantial segment of New York's population when *one* school district allegedly violated Title IX. *Id.* at 282–84. The court emphasized that "dozens" of students were "subjected to their peers' sexual assault and harassment" and "gender-based violence," and that these students were "directly" "injured by the School District's alleged inaction." *Id.* at 282. Also, the school's inaction indirectly effected the parents of the harassed students, future victims of harassment, and the "entire student body." *Id.* at 283. Finally, the court emphasized the toxic effect of discrimination on the entire community because "*Snapp* explicitly recognized the harmful effects wrought on a community by the alleged discriminatory acts of a small subset of its members." *Id.* Taking these harms together, New York pled sufficient facts to support an inference of harm to "a substantial segment of the state's population." *Id.*

This case is much easier than *Niagara-Wheatfield* and cleanly on the side of the line where protecting "'residents from the harmful effects of discrimination'" is a "textbook quasi-sovereign interest[]." *Aziz*, 231

35

F.Supp.3d at 32 (quoting *Snapp*, 458 U.S. at 609). Missouri alleged that Starbucks applies discriminatory policies in *all* of its nearly 200 Missouri stores. App.14–17, R.Doc.1 ¶¶ 46–47, 50–56. Those policies thus affect thousands of employees. And they affect many additional people who apply for those jobs. This discrimination is *far more* widespread than the discrimination alleged in *Niagara-Wheatfield*.

The discrimination here is also more widespread than in *Snapp*. There, the Supreme Court found *parens patriae* standing even though there were only "787 job opportunities at stake" in that case. 458 U.S. at 609. *Snapp* thus makes standing a simple *a fortiori* matter in this case.

Despite the overwhelming weight of precedent, the District Court concluded that "no quasi-sovereign interest is at stake here" because Missouri supposedly "attempt[s] to advance the interests of a select group of private citizens, no different or more righteous than the allegedly discriminatory employment policies [Missouri] seeks to defeat." App.1665, R.Doc.40 at 29. Then, without citation, the court claimed that "[a] different result would lead to a dangerously expansive view of *parens patriae* standing allowing state attorneys general to leverage the full weight of the state's resources to vindicate the individual claims of any

36

citizen they currently deem worthy of attention." *Id.*

This reasoning mischaracterized Missouri's argument. This case is not about an individual discrimination claim with individualized facts. This is about statewide discriminatory policies by a publicly traded company with nearly 200 stores across Missouri. App.14–17, 19, R.Doc.1 ¶¶ 46–47, 50–56, 70. Moreover, the District Court's suggestion—that state attorneys general cannot make enforcement decisions countering widespread discrimination—is astonishing. State attorneys general are, by definition, the officials tasked with "leverag[ing] the … state's resources" to pursue enforcement priorities. App.1665, R.Doc.40 at 29. Indeed, that is one of their essential roles within the American legal system.

Aside from crippling the ability of state attorneys general to protect their citizens, the District Court's reasoning would have other startling consequences. Because the District Court reasoned under Article III, the court impugned the constitutionality of numerous federal laws that authorize *parens patriae* actions. *See* Margaret H. Lemos, *State Enforcement of Federal Law*, 86 N.Y.U. L. Rev. 698, 700 (2011). "Many federal statutes authorize civil enforcement by … states, typically

37

Appellate Case: 26-1258     Page: 47     Date Filed: 04/16/2026 Entry ID: 5629454

through states' attorneys general." *Id.* This includes statutes authorizing states to sue "as parens patriae" for violations of federal antitrust protections,[5] consumer product standards,[6] children's online privacy protections,[7] and much more. *See* Lemos, *supra*, at 708–11 (collecting dozens of similar provisions). State enforcement provisions are also proliferating. "New [state enforcement] provisions have been enacted by virtually every Congress in the last two decades," and "state enforcement has been relatively uncontroversial in Congress." *Id.* at 712. Yet if the District Court's reasoning stands, all those statutory provisions are jeopardized.

Next, the District Court tried to limit Missouri's *parens patriae* authority by holding that *Snapp* establishes a quasi-sovereign interest to fight discrimination against only "Missourians *as Missourians*." App.1666–67, R.Doc.40 at 30–31 (emphasis original). The court also limited a State's quasi-sovereign interests to discrimination that "harms an entire state's populace or impairs a state's equal participation in the federal system." *Id.* at 31.

---

[5] 15 U.S.C. § 15c.
[6] 15 U.S.C. § 2073(b)(1).
[7] 15 U.S.C. § 6504.

Appellate Case: 26-1258     Page: 48     Date Filed: 04/16/2026 Entry ID: 5629454

This is not a plausible reading of *Snapp*. While *Snapp* itself dealt with discrimination against Puerto Ricans, *Snapp*'s reasoning speaks more broadly to a State's interest in preventing the "damage of discrimination" to society. 458 U.S. at 608–09. Indeed, *Snapp* separately analyzed Puerto Rico's interests in protecting its citizens from ethnic discrimination *and* in securing its citizens' "full and equal participation in the federal employment service scheme." *See id.* at 608–10. Thus, *Snapp* treats a State's interest in combatting racial discrimination as an independently-sufficient quasi-sovereign interest. *See id.* Also, *Snapp*'s "substantial *segment*" test lends itself to fighting discrimination against a *segment* of the population, not just to all of a State's citizens as the District Court thought. *Id.* at 607 (emphasis added). *Snapp* also requires courts to account for discrimination's "indirect" harms, *id.* at 607, 609— which the District Court ignored, *see* App.1667, R.Doc.40 at 31.

Unsurprisingly, the District Court failed to cite a single authority adopting its cramped reading of *Snapp*.[8] And if this Court adopts the

---

[8] In fact, the District Court cited only one post-*Snapp* case that denied *parens patriae* standing at all—*Wyatt Bury, LLC v. City of Kansas City*, 804 F.Supp.3d 939 (W.D. Mo. 2025). But *Bury* involved a First Amendment challenge to a city ordinance—not an action "securing

39

District Court's theory, it would—at minimum—create a circuit split with the Second Circuit and roughly a dozen district courts. *Supra* n.1. This Court should decline to become an outlier on the ability of States to sue over racially discriminatory policies.

Finally, the District Court claimed that Missouri lacks a quasi-sovereign interest because individuals can obtain complete relief if they suffer discrimination. App.1667–68, R.Doc.40 at 31–32. To start, one could have made the same claim in *Snapp*, *Niagara-Wheatfield*, and the other cases cited above. In any event, the District Court was wrong to suggest that individuals have a straightforward path to secure relief against Starbucks. Missouri's interest here is to eradicate Starbucks's *statewide* discriminatory policies. Private litigants neither hold this objective, nor are they well-positioned to achieve it. *See Utica*, 177 F.Supp.3d at 749 ("[P]rivate litigants might not have the tenacity or fortitude, or for that matter, the resources or incentives, to achieve complete, lasting relief for the community suffering from the ongoing discrimination …" (cleaned up)); *Griepp*, 991 F.3d at 132 (same); *Porter*,

---

residents from the harmful effects of discrimination." *Snapp*, 458 U.S. at 609.

Appellate Case: 26-1258    Page: 50    Date Filed: 04/16/2026 Entry ID: 5629454

659 F.2d at 316 (same); *Bull HN*, 16 F.Supp.2d at 101–02 (same; collecting cases).

Private individuals also likely cannot obtain statewide remedies against Starbucks's discriminatory policies, whereas Missouri likely can. *See Trump v. CASA*, 606 U.S. 831, 844 (2025) (Injunctions are limited by "party-specific principles."). Class actions are also a poor substitute because class representatives must satisfy many procedural hurdles—including commonality and typicality. Fed. R. Civ. P. 23(a)(2), (3). Defendants like Starbucks can easily oppose class certification simply by emphasizing individualized aspects of the representative's challenge. Further, class counsel often has strong incentives to settle meritorious claims in exchange for attorney's fees. *See, e.g.*, *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 852 (1999).

Comparatively, attorneys general lack this perverse incentive. "In great contrast [to class actions], parens patriae cases are initiated by the state and are normally prosecuted by staff attorneys in the state attorney general's office who are compensated on a salaried basis." Edward Brunet, *Improving Class Action Efficiency by Expanded Use of Parens Patriae Suits and Intervention*, 74 Tul. L. Rev. 1919, 1923 (2000). Thus,

41

Missouri is the only actor that can effectively seek statewide relief against Starbucks's discriminatory scheme. Missouri is anything but a "nominal" party—contrary to the District Court's claim.

*   *   *

Nothing in law or logic suggests Missouri must wait for harmed citizens to bring private lawsuits to stop discriminatory policies by a company with nearly 200 locations statewide. The Court should reverse.

### B. Missouri need not highlight specific Missourians that Starbucks has discriminated against.

The District Court also held that Missouri lacks standing because it supposedly did not allege that "actual Missouri residents applied for an open position in Missouri and were rejected, were passed over for promotion, were disciplined or demoted unfairly, or tried and failed to take advantage of any other benefit of employment with Defendant because of a protected characteristic." App.1663–64, R.Doc.40 at 27–28.

But this is inaccurate. Although the complaint does not name specific Missourians, the complaint establishes that Starbucks imposes several *facially* discriminatory policies against Missourians. *Supra* at 7–15. The complaint also alleges that Starbucks employs and receives applications from thousands of Missourians, and that Starbucks operates

42

nearly 200 stores in Missouri. App.14–15, R.Doc.1 ¶¶ 46–47. Further, the complaint alleges that Starbucks has injured Missourians through these policies. *Id.* ¶¶ 50–56. Taking these allegations together, the District Court was wrong that it could not "reasonably draw the inference that any [Missourians] have been harmed simply because of [Starbucks's] alleged DEI policies." App.1663–64, R.Doc.40 at 27–28. Instead, such an inference is the only reasonable inference in light of Missouri's allegations.

In any event, controlling precedent establishes that "[t]he inability to compete on equal footing" is *itself* a cognizable "injury in fact." *McDaniel v. Precythe*, 897 F.3d 946, 950 (8th Cir. 2018). Said another way, "[t]he injury" in affirmative-action cases is that a "discriminatory classification prevent[s] the plaintiff from competing on an equal footing." *Adarand Constructors v. Pena*, 515 U.S. 200, 211 (1995) (alteration original) (quotation omitted). "The aggrieved party need not allege that he would have obtained the benefit but for the barrier in order to establish standing." *Id.* (quotation omitted). Thus, Missouri's complaint *at least* establishes that Starbucks's facially discriminatory policies prevent thousands of Missourians from competing on an equal footing.

43

Thus, Missouri has alleged Article III standing, and this Court should reverse.

**II.  The District Court misunderstood text and precedent in holding that Missouri lacks authority to enforce Title VII, Section 1981, and the Missouri Human Rights Act.**

Despite its dismissal for lack of standing, the District Court also held that Missouri lacks authority to enforce Title VII, § 1981, and the Missouri Human Rights Act.  This is also wrong.

**A.  Title VII.**

The District Court's holding—that Missouri lacks authority to enforce Title VII—conflicts with text and precedent.  Title VII's "standing provision, codified at 42 U.S.C. § 2000e-5, authorizes civil suits by a 'person claiming to be aggrieved.'" *FedEx*, 268 F.Supp.2d at 197.  And Title VII defines "person" to include "governments" and "governmental agencies."  42 U.S.C. § 2000e(a).

Taken together, these provisions "clearly authorize the State" and the Attorney General's Office, as a government and government agency, "to bring suit under Title VII." *FedEx*, 268 F.Supp.2d at 197.  At least two federal courts have adopted this reading of Title VII, and no court has disagreed.  *See id.*; *Grimmway*, 800 F.Supp.3d at 1103 (holding that California was "authorized to bring suit under Title VII" "[b]ecause states

44

qualify as persons claiming to be aggrieved"). Legal scholars also cite Title VII as an archetypal example of a federal statute authorizing *parens patriae* actions through its text. *See, e.g.*, Lemos, *supra*, at 711.

The District Court did not dispute this textual analysis. Rather, it focused on the fact that a Title VII plaintiff must be "aggrieved" to have a cause of action. App.1669–71, R.Doc.40 at 33–35 (quoting 42 U.S.C. § 2000e-5). The court claimed that Missouri is not "aggrieved" because Missouri "is not an employee or applicant who has faced discrimination" by Starbucks. *Id.* at 34.

However, this reasoning makes no sense in light of Title VII's text. "[S]tatutes should be sensibly construed, with a view to effectuating the legislative intent." *Williams v. U.S. Fid. & Guar. Co.*, 236 U.S. 549, 555 (1915). Title VII's text unambiguously contemplates suits by "governments" because "governments" are included in the statute's definition of "person." 42 U.S.C. § 2000e(a); *FedEx*, 268 F.Supp.2d at 197. And Title VII contemplates enforcement actions by any "person claiming to be aggrieved." 42 U.S.C. § 2000e-5(b). The District Court's reasoning—that "aggrieved" persons are only those "who ha[ve] faced discrimination" themselves, App.1670, R.Doc.40 at 34—makes no sense

45

in the context of governments, 42 U.S.C. § 2000e(a). Of course, governments do not have a race. Thus, it is nonsensical to deny Missouri statutory standing because Missouri did not "face discrimination" on account of its race. Rather, the more sensible reading is that when Title VII refers to "governments," it authorizes the State, as a "guardian," to challenge policies that discriminate against its citizens. *Snapp*, 458 U.S. at 600 n.8. Further, Missouri itself *is* "aggrieved" by racial discrimination, *see* § 2000e-5(b), because Missouri has a "state interest" in stopping "discrimination"—which carries a "universal sting" that harms society, *Snapp*, 458 U.S. at 609.

Moreover, to the extent "aggrieved" is ambiguous, this Court's precedents require a broader construction. As this Court held just six years after Title VII's enactment, "Title VII … is to be accorded a liberal construction in order to carry out the purpose of Congress to eliminate the inconvenience, unfairness and humiliation of racial discrimination." *Parham v. Sw. Bell Tel. Co.*, 433 F.2d 421, 425 (8th Cir. 1970). Since then, this Court has repeatedly reaffirmed the importance of broad readings because "Title VII is a remedial statute" designed to eradicate "discrimination." *Sedlacek v. Hach*, 752 F.2d 333, 337 (8th Cir. 1985);

46

*Clayton v. White Hall Sch. Dist.*, 875 F.2d 676, 679 (8th Cir. 1989); *Baker v. Stuart Broad. Co.*, 560 F.2d 389, 391 (8th Cir. 1977).

Applying this rule, this Court's *Clayton* opinion broadly read the phrase "person claiming to be aggrieved" in Title VII. 875 F.2d at 678–80. *Clayton* held that even a white employee who was not subject to discrimination, but who alleged injury because of race discrimination against a co-worker, was "aggrieved" under Title VII. *Id.* *Clayton* explained that, even though the white employee was not directly discriminated against, her "interest in a work environment free of racial discrimination is clearly within the zone of interest protected by Title VII." *Id.* at 680.

This case is easier than *Clayton*. *Clayton* involved a *single* employee who was "aggrieved" by a "work environment" that was hostile to a *single* co-worker. *Id.* at 679–80. Comparatively, Missouri alleges that Starbucks creates discriminatory work environments at nearly 200 stores across the State through statewide discriminatory policies. App.14–17, R.Doc.1 ¶¶ 46–47, 50–56. Surely, Missouri—which possesses a "state interest" in stopping widespread "discrimination"—is also "aggrieved" here. *Snapp*, 458 U.S. at 609. No other reading of Title VII

47

Appellate Case: 26-1258     Page: 57     Date Filed: 04/16/2026 Entry ID: 5629454

makes sense in light of text and precedent.

To justify its contrary reading, the District Court cited the "zone of interest" test from *Thompson v. North American Stainless*, 562 U.S. 170, 177 (2011). But *Thompson* supports Missouri, not Starbucks. *Thompson* reversed the Sixth Circuit for narrowly construing the term "aggrieved" in Title VII. *Id.* at 172–73. The Court emphasized that Title VII "incorporates" the "zone of interest" test from the Administrative Procedure Act context. *Id.* at 177–78. And the APA's "zone of interest" test denies review only "if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Id.* (quotation omitted). The "zone of interest" test "is not especially demanding" and "the benefit of any doubt goes to the plaintiff." *Lexmark Int'l v. Static Control Components*, 572 U.S. 118, 130 (2014) (cleaned up).

Missouri easily satisfies this standard. Missouri's interests here include protecting its citizens, *Snapp*, 458 U.S. at 609, and stamping out discrimination that is "destructive of democratic society," *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 521 (1989) (Scalia, J., concurring) (quotation omitted). "[T]he Government has a fundamental,

48

overriding interest in eradicating racial discrimination"—even by private organizations. *Bob Jones Univ. v. United States*, 461 U.S. 574, 604 (1983). These interests establish that Missouri is "aggrieved" itself and holds authority to protect "aggrieved" citizens under Title VII.

### B. Section 1981.

Next, the District Court held that States lack authority to enforce § 1981's prohibition on discrimination in "mak[ing]" and "enforc[ing]" employment contracts. App.1671–72, R.Doc.40 at 35–36. But this holding splits with the only other case Missouri is aware of that addresses this question. *See Glickman*, 370 F.Supp. at 728 ("Pennsylvania has standing in this case under the doctrine of parens patriae" to enforce § 1981.). Also, the District Court's decision diverges from many other cases permitting states to enforce other sections of the Civil Rights Act through *parens patriae* actions. *See North Dakota v. Heydinger*, 2016 WL 5661926, *4–6 (D. Minn. Sept. 29, 2016) (A State may "seek relief under § 1983 when it sues in its non-sovereign or quasi-sovereign capacity."), *aff'd sub nom.* 900 F.3d 565 (8th Cir. 2018); *Cornwell*, 695 F.2d at 43 (§ 1985); *Porter*, 659 F.2d at 313–19 (§ 1983); *In re New York City Policing During Summer 2020 Demonstrations*, 548 F.Supp.3d 383, 399 (S.D.N.Y.

49

Appellate Case: 26-1258     Page: 59     Date Filed: 04/16/2026 Entry ID: 5629454

2021) (§ 1983); *Utica*, 177 F.Supp.3d at 749 (§ 1983 and Title VI).

Indeed, courts and scholars have generally recognized that States presumptively have the power to vindicate federal statutes in federal court. *See* F. Andrew Hessick, *Quasi-Sovereign Standing*, 94 Notre Dame L. Rev. 1927, 1939 (2019). For example, *Snapp* permitted Puerto Rico to enforce federal labor laws—even though such laws did not explicitly create a cause of action for States and territories. *See* 458 U.S. at 594; Seth Davis, *Implied Public Rights of Action*, 114 Colum. L. Rev. 1, 44 (2014). Likewise, in *Griepp*, the Second Circuit noted that "States have frequently been allowed to sue in *parens patriae* to enforce federal statutes that do not specifically provide standing for state attorney generals." 991 F.3d at 130 (quotation omitted). "This is especially true in statutory schemes that have broad enforcement provisions, using words like 'any person' or 'the party so injured or deprived' to describe the category of entities eligible to sue." *Id.*; *see also Bull HN*, 16 F.Supp.2d at 103 ("[T]here is nothing unusual about a state seeking enforcement of federal laws that do not specifically provide for state enforcement." (collecting cases)).

Despite these authorities, the District Court insisted that a State

50

suing under § 1981 must "pursue its *own* interests" to have statutory standing. App.1671, R.Doc.40 at 35 (emphasis original). The court cited *Domino's Pizza v. McDonald*, 546 U.S. 470 (2006), and claimed that *Domino*'s abrogated authority holding that States can sue *parens patriae* under § 1981. But *Domino's* had nothing to do with *parens patriae* standing. In that case, the shareholder of a business alleged that Domino's violated a contract with the *business* because of racial animus toward the *shareholder*. *Id.* at 472–74. But the Supreme Court dismissed the suit because the shareholder was suing to vindicate the *business*'s contract rights, not his own. *Id.* at 479–80. The Court held that "a plaintiff cannot state a claim under § 1981 unless he has (or would have) rights under the existing (or proposed) contract that he wishes 'to make and enforce.'" *Id.*

The District Court's claim—that Missouri suing *parens patriae* is equivalent to the shareholder in *Domino's*—misunderstands the very nature of *parens patriae* suits. *Domino*'s noted that "it is fundamental" corporate law "that the shareholder and contracting officer of a corporation has no rights and is exposed to no liability under the corporation's contracts." *Id.* at 477. Comparatively, in a *parens patriae*

51

suit, the State protects its citizens as their "guardian." *Snapp*, 458 U.S. at 600 n.8; *see Griepp*, 991 F.3d at 130. And *Domino's* recognizes no exception to this rule for *parens patriae* actions under § 1981.

Finally, the District Court's claim—that Missouri may only "pursue its *own* interest"—ignores that Missouri *does* have a substantial interest in stopping racial discrimination statewide. As explained above, Missouri itself "has a fundamental, overriding interest in eradicating racial discrimination" by private actors. *Bob Jones*, 461 U.S. at 604. The District Court erred in concluding otherwise.

### C. The Missouri Human Rights Act.

Finally, the District Court held that the Missouri Attorney General lacks authority to enforce the MHRA. App.1672–73, R.Doc.40 at 36–37. This is surprising because Mo. Rev. Stat. § 213.126(1) expressly authorizes "the attorney general" to enforce the MHRA "[w]henever [she] has a reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights granted by [the MHRA]." And the MHRA prohibits Starbucks from discriminating "because of the race … of any individual." Mo. Rev. Stat. § 213.055.1.

Appellate Case: 26-1258    Page: 62    Date Filed: 04/16/2026 Entry ID: 5629454

The District Court nonetheless claimed that the Attorney General lacks authority because her complaint supposedly does not allege that Starbucks's discriminatory policies injure individuals *in Missouri*. App.1672–73, R.Doc.40 at 36–37.

That is simply an implausible interpretation of Missouri's complaint. The complaint alleges that Starbucks imposes several *facially* discriminatory policies across the United States—and the United States includes Missouri. App.26, 39–40, R.Doc.1 ¶¶ 104–06, 182. The complaint also alleges that Starbucks employs and receives applications from thousands of Missourians. *Id.* ¶¶ 46–47. And the complaint repeatedly alleges that Starbucks implements these policies in Missouri to the detriment of Missourians. *Id.* ¶¶ 50–56. Taking these allegations together, the only reasonable inference is that Starbucks is injuring individuals *in Missouri*. This Court should reverse because the District Court failed to draw "all reasonable inferences from the complaint" in Missouri's favor. *Stoltz*, 327 F.3d at 674.

53

**III. In dismissing Missouri's complaint for failure to state a claim, the District Court erred by improperly weighing competing evidence and by overlooking applicable law.**

Finally, the District Court issued a third alternative holding—that Missouri did not plausibly allege claims for relief under Title VII, § 1981, and the MHRA. App.1673–82, R.Doc.40 at 37–46. However, this holding rested on the District Court's version of the facts, not the complaint's allegations. Also, the District Court's legal analysis suffers from misinterpretation of controlling law.

**A. The District Court erroneously weighed competing evidence at the motion-to-dismiss stage.**

Before analyzing specific counts, one global error must be addressed. As noted above, the District Court *sua sponte* ordered Missouri to submit every document cited in its complaint as exhibits for the court's review. This totaled nearly 1,500 pages of documents. Then, without a hearing, the District Court relied on the exhibits to supplement and discount the complaint's allegations. *See supra* 18–23.

This was improper. Controlling precedent required the District Court to "assume" that "all factual allegations in the complaint are true." *Grand River*, 574 F.3d at 935. Further, "all reasonable inferences from the complaint must be drawn in favor of [the plaintiff]." *Stoltz*, 327 F.3d

Appellate Case: 26-1258    Page: 64    Date Filed: 04/16/2026 Entry ID: 5629454

at 674. And "[d]ismissal is inappropriate unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Ulrich*, 715 F.3d at 1058 (quotation omitted). The District Court ignored all these instructions.

The District Court cited three cases to justify its actions: *Gorog v. Best Buy Co.*, 760 F.3d 787 (8th Cir. 2014), *Quinn v. Ocwen Fed. Bank FSB*, 470 F.3d 1240 (8th Cir. 2006), and *Silver v. H&R Block*, 105 F.3d 394 (8th Cir. 1997). App.1651, R.Doc.40 at 15. But none of these authorities support the District Court's pleading-stage fact finding. *Gorog* simply held that courts may rely on a contract attached to a motion to dismiss when the plaintiff's claim rests on the contract. 760 F.3d at 791. *Quinn* held that "a court ruling on a motion to dismiss … may consider material attached to the complaint." 470 F.3d at 1244 (quotation omitted). But Missouri did not attach any of the 1,500 pages of exhibits to its complaint.

Lastly, *Silver* involved an investor who alleged that H&R Block committed securities fraud by making false representations in two news articles. 105 F.3d at 395–96. But the investor's complaint did not include the full text of the articles, and this Court held that the district court

55

could consider the article's full text at the pleading stage. *Id.* at 397. This Court explained that the plaintiff's "entire lawsuit is based only on the statements, and he does not dispute their content." *Id.*

This case is different than *Silver*. Rather than two news articles, the complaint's allegations involve over a thousand pages of exhibits. App.164–1636, R.Doc.39–R.Doc.39-49. Further, the complaint alleges that some of the representations that Starbucks makes in these documents are misleading "pretexts" for discrimination. App.27, 47, R.Doc.1 ¶¶ 111, 226. Thus, *Silver* does not justify the District Court's departure from procedural norms.

**B.      As to Counts 1, 2, and 10, the District Court misjudged text and precedent.**

The District Court erred in dismissing Missouri's Title VII, § 1981, and MHRA claims, which challenge Starbucks's affirmative-action scheme. App.54–57, 63–64, R.Doc.1 ¶¶ 268–93, 328–36. As the District Court noted, courts generally apply the same analysis to Title VII claims, § 1981 claims, and MHRA claims. App.1674, R.Doc.40 at 38 n.36; *Lake v. Yellow Transp.*, 596 F.3d 871, 873 n.2 (8th Cir. 2010); *Matthews v. Harley-Davidson*, 685 S.W.3d 360, 366 (Mo. banc 2024). Thus, this brief jointly analyzes these three counts.

Appellate Case: 26-1258      Page: 66      Date Filed: 04/16/2026 Entry ID: 5629454

Starbucks's scheme combines several *facially* unlawful policies, including overall quotas, hard goals to increase its BIPOC managers (usually by 1.5–5%), and executive compensation tied to achievement of these quotas. *Supra* at 8–12. Even though these policies facially discriminate, the District Court held that Missouri failed to allege "any specific adverse action" by Starbucks. App.1674, R.Doc.40 at 38. The court found that Missouri "must allege that [Starbucks] discharged, failed to hire, or imposed some other detrimental change in … employment," and "[i]t is not enough to state that an allegedly discriminatory policy existed." *Id.* at 38–39 (citing *Muldrow v. City of St. Louis*, 601 U.S. 346, 354 (2024)). The court then tried to undermine many of the factual allegations in Missouri's complaint. *See id.* at 39–41. For example, it emphasized that some of the "percentages" in Starbucks's quotas "had *already been exceeded*, indicating that [Starbucks] need not make any employment decisions, adverse or not … to achieve this demographic balance." *Id.* at 40. This reasoning ignores the complaint's allegations, the text of applicable statutes, and controlling precedent.

As to the complaint's allegations, Missouri *did* allege "adverse actions" even under the District Court's narrow understanding of the

Appellate Case: 26-1258    Page: 67    Date Filed: 04/16/2026 Entry ID: 5629454

term.  Missouri alleged that Starbucks applies its affirmative-action policies against Missourians in the hiring, retention, and promotion process.  *See supra* at 8–12.  Thus, under the District Court's own standard, Missouri alleged that Starbucks is engaging in unlawful adverse actions.

Second, the text of Title VII, the MHRA, and § 1981 reach employment policies that discriminate on their face—even outside the District Court's limited list of "adverse action[s]."  App.1674–75, R.Doc.40 at 38–39.  Title VII and the MHRA prohibit Starbucks from discriminatorily refusing "to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment."  42 U.S.C. § 2000e-2(a)(1); Mo. Rev. Stat. 213.055.1(1)(a).  Likewise, § 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right … to *make and* enforce contracts."  42 U.S.C. § 1981(a) (emphasis added).  Here, Starbucks's company-wide policy discriminates against employees and applicants for promotions and hiring.  That policy itself violates Title VII, § 1981, and the MHRA through its facial disparate treatment.  It is that simple.  *See Frank v. United Airlines*, 216

58

F.3d 845, 853 (9th Cir. 2000) ("An employer's policy amounts to disparate treatment if it treats men and women differently on its face.").

Several courts have rejected atextual attempts to limit Title VII's reach to only a particular list of adverse actions. For example, the en banc Fifth Circuit recently reversed its "decades-old, atextual precedent" that limited actionable Title VII claims to so-called "ultimate employment decisions." *Hamilton v. Dallas Cnty.*, 79 F.4th 494, 497 (5th Cir. 2023) (en banc). Focusing on the statute's text, the court emphasized that "Title VII's coverage" is not "limited to 'economic' or 'tangible' discrimination." *Id.* at 501 (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986)). Rather, its text "evinces a congressional intent to strike at the entire spectrum of disparate treatment … in employment." *Id.* (quoting *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 78 (1998)). Accordingly, the court applied Title VII to a facially discriminatory scheduling policy. *Id.* Other circuits have also reversed district courts for misapplying the "adverse action" test to facially discriminatory policies. *See Threat v. City of Cleveland*, 6 F.4th 672, 677–79 (6th Cir. 2021); *Piercy v. Maketa*, 480 F.3d 1192, 1204 (10th Cir. 2007).

59

Appellate Case: 26-1258     Page: 69     Date Filed: 04/16/2026 Entry ID: 5629454

Next, the District Court cited the Supreme Court's *Muldrow* opinion for the proposition that Title VII reaches only a particular list of adverse actions. App.1674–75, R.Doc.40 at 38–39. But this misunderstands *Muldrow*. *Muldrow* abrogated this Court's rule that discriminatory job transfers are cognizable under Title VII only if they cause a "materially significant disadvantage" to an employee. 601 U.S. at 350, 352–55. The Supreme Court disagreed because "Title VII's text nowhere establishes that high bar." *Id.* at 350. *Muldrow* also rejected other opinions where "courts rewrote Title VII, compelling workers to make a showing that the statutory text does not require." *Id.* at 355–56.

Recently, this Court emphasized that *Muldrow* "obviated the requirement—replete in our case law—that the claimed injury be 'significant,' 'material,' or 'serious.'" *Cole v. Grp. Health Plan*, 105 F.4th 1110, 1114 (8th Cir. 2024) (citation omitted). "After *Muldrow*, [a plaintiff] is only required to plead 'some harm respecting an identifiable term or condition of employment.'" *Id.* Then, in light of *Muldrow*, this Court reversed a district court's dismissal of a Title VII claim for lack of "adverse action." *See id.* at 1114–15 ("Dismissal of the complaint on the basis of no adverse action is improper at this stage of the proceedings.");

60

*accord Patrick v. Henderson*, 255 F.3d 914, 916 (8th Cir. 2001) ("[A]dverse employment action is a fact issue that is rarely appropriate for Rule 12 resolution."). Thus, the District Court's citation of *Muldrow* misunderstands the significance of the *Muldrow* opinion.

Indeed, in the lead-up to *Muldrow*, one EEOC Commissioner noted that *Muldrow* would implicate the DOJ's and the EEOC's "broader, textualist reading of what constitutes 'adverse action' in the workplace under Title VII." *See* Hon. Andrea Lucas, *With Supreme Court affirmative action ruling, it's time for companies to take a hard look at their corporate diversity programs*, REUTERS (June 29, 2023).[9] Like Missouri, the DOJ and the EEOC read Title VII to "bar[] discrimination in all actions affecting 'terms, conditions, or privileges of employment'—including actions falling short of hiring, firing, or promotion." *Id.* And this more "expansive view"—which the *Muldrow* opinion supports—implicates "host of increasingly popular race-conscious corporate initiatives." *Id.* As examples, the Commissioner identified many of the exact policies at issue here, including: "race-restricted access to

---

[9] https://www.reuters.com/legal/legalindustry/with-supreme-court-affirmative-action-ruling-its-time-companies-take-hard-look-2023-06-29/

Appellate Case: 26-1258    Page: 71    Date Filed: 04/16/2026 Entry ID: 5629454

mentoring," and "tying executive or employee compensation to the company achieving certain demographic targets." *Id.*; *see also Hamilton*, 79 F.4th at 509 (Ho, J., concurring) (agreeing that these policies violate Title VII). Thus, *Muldrow* provides no support to the District Court.

The District Court's reasoning also makes little sense. It emphasized that Starbucks's quota "percentages had already been exceeded, indicating that [Starbucks] need not make any employment decisions, adverse or not … to achieve this demographic balance." App.1676, R.Doc.40 at 40 (emphasis omitted). But this claim is not supported by the complaint. It also contradicts many of the complaint's allegations, including that Starbucks aims to "improve[]" the percentage of its BIPOC managers by a quota of 1.5–5% each year. *See* App.28, 39–40, R.Doc.1 ¶¶ 118, 182.

Further, even assuming the truth of the District Court's unsupported allegation, this Court's precedents repeatedly hold that quotas established to "maintain" a racial "balance" are unlawful. *See Humphries*, 580 F.3d at 695–96; *Maitland v. Univ. of Minnesota*, 155 F.3d 1013, 1016 (8th Cir. 1998). An "affirmative action" policy is lawful only if it "is remedial and narrowly tailored to meet the goal of remedying the

62

effects of past discrimination." *Humphries*, 580 F.3d at 695. Accordingly, any lawful policy "must be 'intended to attain a balance, not to maintain one.'" *Id.* (quoting *Maitland*, 155 F.3d at 1016). Starbucks's quotas fail under this standard *even if* the District Court's unsupported factual allegations are true.

### C.    As to Counts 6 and 7, the District Court's few sentences of analysis failed to justify Starbucks's Partner Networks.

The District Court's dismissal of counts 6 and 7 was also wrong. Counts 6 and 7 allege that Starbucks's Partner Networks unlawfully limit, segregate, and classify Starbucks's employees based on race. *See* 42 U.S.C. § 2000e-2(a)(2); Mo. Rev. Stat. § 213.055.1(1)(b).

The District Court dismissed these counts for two reasons. First, the court claimed that Title VII and the MHRA also establish an adverse action requirement for classification claims. App.1674–75, R.Doc.40 at 38–39. However, the Partner Networks *do* adversely affect employees. The Partner Networks facially classify employees based on race—there's a "Black Partner Network," for example. App.43–44, R.Doc.1 ¶¶ 203–07. Then, representatives from each Partner Network speak to the companies' leadership on behalf of all employees possessing that

63

protected trait. *Id.* ¶¶ 211–13. This adversely affects supposedly "represented" employees by siloing them into interest groups based on their skin color instead of their ideas. There are also no Partner Networks for white employees. *Id.* ¶ 220. Thus, this scheme violates the plain text of Title VII and the MHRA by "classify[ing] … employees … in [a] way which would deprive *or tend to deprive* any individual of employment opportunities or otherwise adversely affect his status as an employee." 42 U.S.C. § 2000e-2(a)(2) (emphasis added); Mo. Rev. Stat. § 213.055.1(1)(b). *Muldrow* forbids the District Court's attempt to impose a heightened version of the "adverse action" standard beyond Title VII's plain text. 601 U.S. at 350, 355–56.

Second, the District Court claimed that the Partner Networks do not segregate or classify because they are "open to all employees regardless of protected class." App.1678, R.Doc.40 at 42. But this conclusion is not supported by the allegations in Missouri's complaint. Rather, the complaint alleges that this assertion by Starbucks is "merely pretext to cover up [Starbucks's] unlawfully discriminatory intentions." App.46–47, R.Doc.1 ¶¶ 219, 224, 226. The District Court failed to "assume" the truth of this allegation based on its weighing of evidence at

64

the motion-to-dismiss stage. *Grand River*, 574 F.3d at 935. At any rate, even if Starbucks does, in fact, allow all employees to join Partner Networks, Missouri has still plausibly alleged that the Partner Networks at least "tend to deprive" employees of opportunities through their facial designation of networks for specific races. 42 U.S.C. § 2000e-2(a)(2); Mo. Rev. Stat. § 213.055.1(1)(b).

**D.    As to Count 3, the District Court ignored statutory text and Missouri Supreme Court precedent.**

In Count 3, Missouri alleged that Starbucks "aid[ed], abet[ted], incite[d], compel[led], or coerce[d] the commission of acts prohibited under" the MHRA. Mo. Rev. Stat. § 213.070.1(1). Indeed, Starbucks incites unlawful action by instructing employees to discriminate and tying their compensation to compliance with that instruction. App.23–41, 57–58, R.Doc.1 ¶¶ 89–188, 294–301.

The District Court dismissed Count 3 by holding that § 213.070 does not apply to circumstances where an employer requires its *own* employees to discriminate. App.1679, R.Doc.40 at 43. The court claimed that Count 3 illogically alleges that Starbucks aided and abetted itself because Starbucks "necessarily acts through its own employees." *Id.*

65

However, the text of § 213.070.1 implicates circumstances when "an employer" "attempt[s]" to "incite" or "compel" discrimination by its employees. Section 213.070.1(1) provides, in full:

> 1. It shall be an unlawful discriminatory practice for an *employer*, employment agency, labor organization, or place of public accommodation:

> (1) To aid, abet, incite, compel, or coerce the commission of acts prohibited under this chapter or *to attempt* to do so …

*Id.* (emphasis added). This is broad enough to encompass "attempt[s]" by Starbucks to use company policy to coerce or incite discriminatory actions by its employees. *Id.* There is also no language in this provision suggesting that Starbucks can escape liability by having its employees aid and abet discrimination by other employees.

The District Court also claimed that *Matthews v. Harley-Davidson*, 685 S.W.3d 360 (Mo. banc 2024), adopted its reading of the MHRA's aiding-and-abetting prohibition. But the court misread *Matthews*. Of course, as the District Court noted, *Matthews* held that Harley and Syncreon (another company) aided and abetted each other by "covering up unlawful discrimination among their shared workforce" at a manufacturing plant. App.1679, R.Doc.40 at 43; *Matthews*, 685 S.W.3d at 370. But *Matthews* never held that an "employer" cannot likewise aid,

66

abet, incite, or compel discrimination by its own employees. *See* 685 S.W.3d at 370. Rather, the court found that Harley aided and abetted discrimination by its own employees through Harley's policies and practices. For example, "Harley physically divided the Plant with a line that the predominantly black Syncreon employees were prohibited from crossing, but that the majority-white Harley employees were permitted to cross, and provided bathrooms that were functionally racially segregated." *Id.* (cleaned up). Also, "Harley failed to prohibit … *its own employees* from engaging in acts creating the alleged hostile work environment. In doing so, Harley affirmed the ongoing racial conflict conducted by others in the Plant and substantially encouraged or assisted in the creation of a hostile work environment." *Id.* (emphasis added). Thus, *Matthews* does not support the District Court. Instead, it suggests that an "employer" can aid, abet, incite, or compel discrimination by its own employees in violation of the MHRA.

### E. As to Counts 4 and 5, the District Court excused Starbucks's mentorship program because of outside evidence that, in any event, does not undermine Missouri's damages claims.

Finally, counts 4 and 5 allege that Starbucks unlawfully "discriminate[s]" "in admission to, or employment in, any program

67

Appellate Case: 26-1258     Page: 77     Date Filed: 04/16/2026 Entry ID: 5629454

established to provide apprenticeship or other training." 42 U.S.C. § 2000e-2(d); Mo. Rev. Stat. § 213.055.1(2). Indeed, Starbucks's mentorship program is only available for BIPOC employees. App.22, 34–35, 41, R.Doc.1 ¶¶ 85–86, 147–52, 189–93. Also, even the District Court acknowledged that the mentorship programs "were, at least initially, unavailable to white men." App.1680, R.Doc.40 at 44.

Nonetheless, the District Court dismissed counts 4 and 5 because of its pleading-stage factual findings. Specifically, the court found that Starbucks's "mentorship program originally designed for BIPOC employees … is now open to all employees" as of 2023. *See id.* at 3–4, 44. But this factual assertion is not supported by Missouri's complaint. *Grand River*, 574 F.3d at 935.

In any event, Missouri's complaint alleges several damages claims. App.65, R.Doc.1 at 58. So, even if the District Court could make factual findings, Starbucks's prospective change in policy would not moot Missouri's claims for retrospective relief. *See Uzuegbunam v. Preczewski*, 592 U.S. 279, 283 (2021). The District Court erred by dismissing counts 4 and 5 without explaining why a prospective change in Starbucks's policy moots Missouri's damages claims.

## CONCLUSION

The Court should reverse and remand for this case to proceed to discovery and trial on the merits. In the alternative, if the Court agrees that the District Court erred on the law, but finds Missouri's allegations insufficient, Missouri respectfully requests reversal, remand, and an opportunity to amend its complaint.

April 15, 2026                                    Respectfully submitted,

**CATHERINE L. HANAWAY**
MISSOURI ATTORNEY GENERAL

*/s/ Louis J. Capozzi, III*
Louis J. Capozzi III, #77756MO
  *Solicitor General*
J. Patrick Sullivan, #42968MO
  *Deputy Solicitor General*
J. Michael Patton, #76490MO
  *Deputy Solicitor General*
Office of the Attorney General
Old Post Office Building
815 Olive St, Suite 200
St. Louis, MO 63101
Office: (314) 340-3413
Louis.Capozzi@ago.mo.gov

*Counsel for the State of Missouri*

Appellate Case: 26-1258     Page: 79     Date Filed: 04/16/2026 Entry ID: 5629454

## CERTIFICATE OF COMPLIANCE

I hereby certify that this document complies with the type-volume limits of Fed. R. App. P. 32(a)(7)(B)(i) in that it contains 12,993 words excluding the parts exempted by Fed. R. App. P. 32(f). I further certify that this document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) in that this document has been prepared in a proportionally spaced typeface using Microsoft Word (size 14 Century Schoolbook font).

*/s/ Louis J. Capozzi, III*

Louis J. Capozzi, III
Solicitor General


## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above was electronically filed by using the CM/ECF system. Counsel for Appellee will receive a copy of the above document through the CM/ECF system on April 15, 2026.

*/s/ Louis J. Capozzi, III*

Louis J. Capozzi, III
Solicitor General

Appellate Case: 26-1258    Page: 80    Date Filed: 04/16/2026 Entry ID: 5629454