# United States Court of Appeals

*for the*

# Eighth Circuit

Case No. 26-1258

STATE OF MISSOURI, *ex rel.* CATHERINE L. HANAWAY,
Attorney General of Missouri,

*Plaintiff-Appellant,*

– v. –

STARBUCKS CORPORATION,

*Defendant-Appellee.*

RICHARD RAY BRATTIN; JASON BEAN; JAMIE BURGER;
JILL CARTER; KURTIS GREGORY; NICK SCHROER; CURTIS TRENT;
STATE OF FLORIDA; STATE OF ALABAMA; STATE OF ARKANSAS;
STATE OF GEORGIA; STATE OF IDAHO; STATE OF INDIANA; STATE OF
IOWA; STATE OF KANSAS; STATE OF LOUISIANA; STATE OF
MISSISSIPPI; STATE OF MONTANA; STATE OF NEBRASKA; STATE OF
NORTH DAKOTA; STATE OF OHIO; STATE OF OKLAHOMA; STATE OF
SOUTH CAROLINA; STATE OF SOUTH DAKOTA; STATE OF TEXAS;
STATE OF UTAH; STATE OF WEST VIRGINIA,

*Amici on Behalf of Appellant(s).*

ON APPEAL FROM AN ORDER OF THE UNITED STATES
DISTRICT COURT FOR THE EASTERN DISTRICT OF MISSOURI
IN NO. 4:25-CV-00165, HONORABLE JOHN A. ROSS, JUDGE

## APPELLEE'S BRIEF

JAMES F. BENNETT
DOWD BENNETT LLP
7676 Forsyth Boulevard, Suite 1900
St. Louis, Missouri 63105
(314) 889-7300

ESTHER G. LANDER
ORRICK, HERRINGTON & SUTCLIFFE LLP
2100 Pennsylvania Avenue, NW
Washington, D.C. 20037
(202) 339-8529

*Attorneys for Appellee Starbucks Corporation*

COUNSEL PRESS
A ▷ Proceed Service
The Appellate Experts®

(800) 4-APPEAL • (625196)

**SUMMARY OF THE CASE AND REQUEST FOR ORAL ARGUMENT**

Missouri's Attorney General filed a complaint alleging Starbucks violated federal and state anti-discrimination laws through (i) the adoption of now-expired aspirational representation targets, (ii) the prior structure of its bonus compensation provided to named executives, (iii) the operation of a former mentorship program, and (iv) the allowance of employee-led interest groups. The Complaint did not allege any injury or impact in Missouri from any of the challenged policies or practices.

The district court properly granted Starbucks' motion to dismiss, holding the Attorney General lacks standing and statutory authority to pursue the claims alleged and has not pled facts sufficient to state a claim for relief. The district court held Missouri has not alleged a concrete injury, much less harm to its own quasi-sovereign interests and, therefore, could not establish Article III or *parens patriae* standing. That holding is consistent with the seminal Supreme Court case, *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel. Barez*, 458 U.S. 592 (1982), and other cases across the country. The district court also correctly held Missouri has not stated a claim under any federal or state statute because the Complaint fails to allege any impact in Missouri or to Missouri's interests, any adverse employment action, or any practice that supported an inference of discrimination.

Starbucks respectfully requests fifteen minutes per side for oral argument.

i

# CORPORATE DISCLOSURE STATEMENT

Defendant-Appellee Starbucks Corporation is a publicly-traded corporation that has no parent company, and no publicly-traded corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

SUMMARY OF THE CASE AND REQUEST FOR ORAL ARGUMENT ............ i

CORPORATE DISCLOSURE STATEMENT ................................................... ii

TABLE OF CONTENTS ............................................................................... iii

TABLE OF AUTHORITIES ............................................................................ v

STATEMENT OF THE ISSUES ..................................................................... 1

STATEMENT OF THE CASE ......................................................................... 2

    I.    Factual Background ................................................................... 4

        A.  Starbucks' Operations ..................................................... 4

        B.  Starbucks' Inclusion Goals ............................................. 5

            1.  Starbucks' Commitment to Belonging .................... 5

            2.  Starbucks' Expired Aspirational Diversity-Representation Targets ................................................................... 6

        C.  Starbucks' Named-Executives' Bonus-Compensation Plans. ........... 7

            1.  Bonus Plan ............................................................. 8

            2.  PRSUs ................................................................... 10

        D.  Starbucks' Mentorship Program and Partner Networks. .................. 11

    II.   Procedural History ................................................................ 12

SUMMARY OF THE ARGUMENT ................................................................ 15

ARGUMENT ............................................................................................ 18

STANDARD OF REVIEW ........................................................................... 18

    I.    Missouri Does Not Have Standing. ...................................... 19

        A.  The Attorney General Has Not Alleged a Concrete Injury-in-Fact. 19

        B.  The Complaint Does Not Allege Facts that Could Establish *Parens Patriae* Standing. ......................................................... 22

            1.  A State Must Allege an Injury to a Quasi-Sovereign Interest that Threatens a Concrete and Widespread Impact on its General Population. .......................................................... 22

2.  Missouri has not alleged Starbucks' policies injured a quasi-sovereign interest or substantial number of Missourians. ........25

3.  *Snapp* did not establish an exception for discrimination suits..28

II.  The Attorney General Lacks Statutory Authority to Pursue the Claims Pled..........................................................................................32

A.  Title VII Does Not Authorize Suits by State Attorneys General.....32

B.  The Attorney General Cannot Bring a Claim Under §1981............37

C.  The MHRA Claims Pled Are Not Within the Attorney General's Enforcement Authority. ...................................................................39

III.  The Complaint Fails to State a Plausible Claim for Relief....................42

A.  The District Court Properly Considered the Public Documents Referenced in the Complaint. ...........................................................42

B.  The Complaint Does Not Allege Any Concrete Harm to an Employment Condition or Opportunity...........................................45

C.  The Complaint Does Not Allege a Plausible Aiding-and-Abetting Claim ...............................................................................................50

D.  The Attorney General Has Not Alleged an Unlawful Training Program ...........................................................................................52

E.  The Complaint Does Not State a Claim for Unlawful Segregation 53

CONCLUSION.............................................................................................56

CERTIFICATE OF COMPLIANCE.............................................................57

CIRCUIT RULE 28A(h) CERTIFICATION ...............................................58

CERTIFICATE OF SERVICE .....................................................................59

# TABLE OF AUTHORITIES

**Cases**

*8000 Maryland, LLC v. Huntleigh Financial Services*,
292 S.W.3d 439 (Mo. App. 2009)..................................................................... 51, 52

*Agred Foundation v. U.S. Army Corps of Engineers*,
3 F.4th 1069 (8th Cir. 2021) ................................................................................. 18

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel. Barez*,
458 U.S. 592 (1982) ..................................................................................... passim

*Arizona v. Garland*,
730 F. Supp. 3d 258 (W.D. La. 2024)................................................................... 30

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ....................................................................................... 42, 43

*Aziz v. Trump*,
231 F. Supp. 3d 23 (E.D. Va. 2017).................................................................... 31

*Barrett v. Cole County*,
687 S.W.3d 685 (Mo. App. 2024)........................................................................ 41

*Bell Atlantic v. Twombly*,
550 U.S. 544 (2007) ......................................................................... 18, 42, 43

*Brown v. General Services Administration*,
425 U.S. 820 (1976) ............................................................................................. 33

*Civil Rights Department v. Grimmway Enterprises*,
800 F. Supp. 3d 1084 (E.D. Cal. 2025) ............................................... 31, 34, 35

*Clayton v. White Hall School District*,
875 F.2d 676 (8th Cir. 1989)............................................................................... 35

*CMR D.N. Corporation v. Philadelphia*,
703 F.3d 612 (3d Cir. 2013)................................................................. 46, 47, 53

*Cody v. Hillard*,
304 F.3d 767 (8th Cir. 2002)..................................................................36

*Coleman v. Quaker Oats Company*,
232 F.3d 1271 (9th Cir. 2000)..............................................................49

*Collins v. Union Pacific Railroad Company*,
108 F.4th 1049 (8th Cir. 2024) ............................................................46

*Commonwealth of Pennsylvania v. Flaherty*,
547 F Supp. 172 (W.D. Pa. 1982)........................................................31

*Commonwealth of Pennsylvania v. Glickman*,
370 F. Supp. 724 (W.D. Pa. 1974)...................................................31, 39

*Commonwealth of Pennsylvania v. Porter*,
659 F.2d 306 (3d Cir. 1981)..................................................................31

*Comcast Corporation v. National Association of African American-Owned Media*,
589 U.S. 327 (2020) ..............................................................................38

*Domino's Pizza, Inc. v. McDonald*,
546 U.S. 470 (2006) ...........................................................................1, 38

*Dzibela v. BlackRock Inc.*,
2024 WL 4349813 (D.N.J. Sept. 30, 2024)...........................................49

*EEOC v. FedEx*,
268 F. Supp. 2d 192 (E.D.N.Y. 2003)....................................................34

*EEOC v. McDonnell Douglas Corporation*,
191 F.3d 948 (8th Cir. 1999)................................................................41

*EEOC v AutoZone, Inc.*,
860 F.3d 564 (7th Cir. 2017).................................................................55

*Estados Unidos Mexicanos v. DeCoster*,
229 F.3d 332 (1st Cir. 2000).................................................................30

*Ezell v. Chicago*,
  651 F.3d 684 (7th Cir. 2011)..........................................................46, 47, 53

*FCS Advisors, LLC v. Missouri*,
  929 F.3d 618 (8th Cir. 2019).................................................................38

*Foster v. Wyrick*,
  823 F.2d 218 (8th Cir. 1987).................................................................33

*Frank v. United Airlines*,
  216 F.3d 845 (9th Cir. 2000).................................................................47

*General Electric Company v. Jackson*,
  595 F. Supp. 2d 8 (D.D.C. 2009).............................................................41

*Gladstone Realtors v. Village of Bellwood*,
  441 U.S. 91 (1979) ........................................................................30

*Glick v. Western Power Sports, Inc.*,
  944 F.3d 714 (8th Cir. 2019)............................................................18, 19

*Glore v. Potosi R-III School District*,
  722 F. Supp. 3d 950 (E.D. Mo. 2024) .......................................................52

*Gorog v. Best Buy Co., Inc.*,
  760 F.3d 787 (8th Cir. 2014).................................................................44

*Government of Manitoba v. Bernhardt*,
  923 F.3d 173 (D.C. Cir. 2019) ...........................................................22, 30

*Hackett v. McGuire Brothers, Inc.*,
  445 F.2d 442 (3d Cir. 1971).................................................................34

*Hafley v. Lohman*,
  90 F.3d 264 (8th Cir. 1996).................................................................43

*Hamilton v. Dallas County*,
  79 F.4th 494 (5th Cir. 2023) ...............................................................47

*Harrison v. Jefferson Parish School Board*,
  78 F.4th 765 (5th Cir. 2023) .................................................................. 22, 23, 24

*Illig v. Union Electric Company*,
  652 F.3d 971 (8th Cir. 2011)......................................................................... 18, 44

*In re Electronic Books Antitrust Litigation*,
  14 F. Supp. 3d 525 (S.D.N.Y. 2014) ................................................................. 30

*In re Packaged Seafood Products Antitrust Litigation*,
  338 F. Supp. 3d 1079 (S.D. Cal. 2018)......................................................... 26, 27

*Katun Corporation v. Clarke*,
  484 F.3d 972 (8th Cir. 2007)............................................................................. 44

*Maitland v. University of Minnesota*,
  155 F.3d 1013 (8th Cir. 1998).......................................................................... 47

*Mangold v. PECO Energy*,
  2021 WL 6072818 (E.D. Pa. Dec. 23, 2021)..................................................... 49

*Massachusetts v. Bull HN Information Systems, Inc.*,
  16 F. Supp. 2d 90 (D. Mass. 1998) .................................................................. 31

*Matthews v. Harley-Davidson*,
  685 S.W.3d 360 (Mo. 2024) ........................................................................ 50, 51

*McCormick v. Gasper*,
  2022 WL 16586621 (6th Cir. Nov. 1, 2022)..................................................... 49

*Missouri ex rel. Bailey v. People's Republic of China*,
  90 F.4th 930 (8th Cir. 2024) ........................................................................... 24

*Missouri ex rel. Koster v. Harris*,
  847 F.3d 646 (9th Cir. 2017)..................................................................... passim

*Morgan v. United Parcel Service of America, Inc.*,
  380 F.3d 459 (8th Cir. 2004)........................................................................... 41

*Moses.com Securities, Inc. v. Comprehensive Software Systems, Inc.*,
    406 F.3d 1052 (8th Cir. 2005)..................................................................... 44

*Muldrow v. City of St. Louis*,
    601 U.S. 346 (2024) ............................................................ 1, 45, 46, 55

*Musa v. Soar Corporation*,
    2014 WL 6809019 (E.D. Pa. Dec. 1, 2014)...................................... 49

*Navajo Nation v. Wells Fargo & Company*,
    344 F. Supp. 3d 1292 (D.N.M. 2018)...................................... 23, 24, 31

*New York v. Griepp*,
    991 F.3d 81 (2d Cir. 2021)................................................................... 32

*NY by James v. Niagara-Wheatfield Central School District*,
    119 F. 4th 270 (2d Cir. 2024)............................................................. 32

*Paxton v. Dettelbach*,
    105 F.4th 708 (5th Cir. 2024) ..................................................... 23, 31

*People by Abrams v. 11 Cornwell Company*,
    695 F.2d 34 (2d Cir. 1982)................................................................. 32

*People of NY by Abrams v. Holiday Inns, Inc.*,
    656 F. Supp. 675 (W.D.N.Y. 1984)................................................... 26

*Pfizer, Inc. v. Lord*,
    522 F.2d 612 (8th Cir 1975) ............................................................. 23

*Quinn v. Ocwen Federal Bank FSB*,
    470 F.3d 1240 (8th Cir. 2006)........................................................... 44

*Radford v. Potosi R-III School District*,
    2024 WL 1178000 (E.D. Mo. Mar. 19, 2024) .............................. 52

*Raytheon Aircraft Company v. U.S.*,
    435 F. Supp. 2d 1136 (D. Kan. 2006)............................................. 41

*Reed v. Agilent Technologies, Inc.*,
  174 F. Supp. 2d 176 (D. Del. 2001)..................................................................... 49

*Rialto v. West Coast Loading Corporation*,
  581 F.3d 865 (9th Cir. 2009)............................................................................. 41

*School of the Ozarks, Inc. v. Biden*,
  41 F.4th 992 (8th Cir. 2022) ............................................................................. 18

*Sherrer v. Boston Scientific Corporation*,
  609 S.W.3d 697 (Mo. 2020) ............................................................................. 51

*Silver v. H&R Block, Inc.*,
  105 F.3d 394 (8th Cir. 1997)............................................................................. 44

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016) ................................................................................... passim

*State v. Nelson*,
  576 F. Supp. 3d 1017 (M.D. Fla. 2021).............................................................. 30

*Thompson v. North American Stainless, LP*,
  562 U.S. 170 (2011)...................................................................................... 1, 34

*Threat v. Cleveland*,
  6 F.4th 672 (6th Cir. 2021) ............................................................................... 47

*Turning Point USA at Arkansas State University v. Rhodes*,
  409 F. Supp. 3d 677 (E.D. Ark. 2019).............................................................. 48

*Tuttle v. Dobbs Tire & Auto Centers, Inc.*,
  590 S.W.3d 307 (Mo. 2019) .......................................................................... 1, 40

*Ulrich v. Pope County*,
  715 F.3d 1054 (8th Cir. 2013)........................................................................... 43

*West Easton Two, LP v. Borough Council of West Easton*,
  489 F. Supp. 3d 333 (E.D. Pa. 2020) ............................................................... 54

*Wyatt Bury, LLC v. Kansas City*,
  804 F. Supp. 3d 939 (W.D. Mo. 2025) ........................................................... 32

*Young America's Foundation v. Kaler*,
  14 F.4th 879 (8th Cir. 2021) ........................................................................ 47

**Statutes**

15 U.S.C. §15c .............................................................................................. 29

15 U.S.C. §2073(b)(1) ................................................................................... 29

15 U.S.C. §6504 ............................................................................................ 29

42 U.S.C. §1981 ...................................................................................... passim

42 U.S.C. §2000e ....................................................................................... 2, 33

42 U.S.C. §2000e-2(a)(1) .............................................................................. 45

42 U.S.C. §2000e-2(a)(2) .............................................................................. 54

42 U.S.C. §2000e-5(c) ................................................................................... 35

42 U.S.C. §2000e-5(f)(1) ..................................................................... 1, 33, 37

42 U.S.C. §2000e-6(a) ................................................................................... 33

42 U.S.C. §2000e-7 ....................................................................................... 33

42 U.S.C. §§2000e-2(a), (d) ............................................................................ 1

42 U.S.C. §§2000e-5(b), (f)(1) ...................................................................... 36

§213.010, *et seq.*, RSMo ................................................................................. 2

§2000e-5(b) ................................................................................................... 33

§213.055.1(1)(a), RSMo ................................................................................ 45

§213.055.1(1)(b), RSMo ...................................................................... 54

§213.055.1, RSMo ................................................................................ 1

§213.070.1(1), RSMo ........................................................................... 50

§213.126.1, RSMo ..................................................................... 1, 39, 40

§§2000e-5(b) and (f)(1) ...................................................................... 36

**Rules**

Fed. R. App. P. 32(a)(5) ...................................................................... 57

Fed. R. App. P. 32(a)(6) ...................................................................... 57

Fed. R. App. P. 32(a)(7) ...................................................................... 57

Fed. R. App. P. 32(f) ........................................................................... 57

Fed. R. Civ. Proc. 12(b)(1) & (2) ....................................................... 13

Fed. R. Civ. Proc. 12(b)(6) ........................................................... 13, 18

# STATEMENT OF THE ISSUES

I. Whether Missouri lacks standing to bring federal claims challenging a private employer's national employment policies in federal court.

*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016);

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel. Barez*, 458 U.S. 592 (1982);

*Missouri ex rel. Koster v. Harris*, 847 F.3d 646 (9th Cir. 2017).

II. Whether Missouri's claims fall outside the scope of authorized claims under Title VII, §1981, or the Missouri Human Rights Act.

42 U.S.C. §2000e-5(f)(1);

42 U.S.C. §1981;

§213.126.1, RSMo.;

*Thompson v. North American Stainless, LP*, 562 U.S. 170 (2011);

*Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470 (2006);

*Tuttle v. Dobbs Tire & Auto Centers*, 590 S.W.3d 307 (Mo. 2019).

III. Whether Missouri failed to allege facts to state a plausible claim for relief.

42 U.S.C. §§2000e-2(a), (d);

§213.055.1, RSMo.; *id.* §213.070.1;

*Muldrow v. City of St. Louis*, 601 U.S. 346 (2024).

1

**STATEMENT OF THE CASE**

The Attorney General brings a facial challenge to Starbucks' prior policies and practices seeking to promote an inclusive work environment where all employees— regardless of race, or gender—are valued and supported. The Complaint relies almost entirely on the discussion of Starbucks' policies and practices in public documents[1] and the Attorney General's unsupported speculation. Based solely on the documents' descriptions, the Attorney General alleges Starbucks' previous representation targets, executive compensation plans, and employee programs violate Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, *et seq.*, ("Title VII"), § 1981 of the Civil Rights Act of 1866, 42 U.S.C. §1981 ("§1981"), and the Missouri Human Rights Act, §213.010, *et seq.*, RSMo. ("MHRA"). The Complaint does not allege any facts regarding how the outdated policies challenged were developed or how they have been implemented. Nor does the Complaint allege any connection between the challenged policies and Missouri—it does not allege any discriminatory action allegedly taken in Missouri, any person affected by any action

---

[1] These include Starbucks' 2021-2024 Annual Reports/Forms 10-K, Jt.App.473, R.Doc.39-20, 1; Jt.App.1382, R.Doc.39-45, 1; Jt.App.785, R.Doc.39-26, 1; Jt.App.236, R.Doc.39-15, 1; 2020-2025 Notices of Annual Meeting of Shareholders and Proxy Statements, Jt.App.1538, R.Doc.39-48, 1; Jt.App.610, R.Doc.39-23, 1; Jt.App.240, R.Doc.39-18, 1; Jt.App.885, R.Doc.39-27, 1; Jt.App.352, R.Doc.39-19, 1; Jt.App.1205, R.Doc.39-33, 1; and 2020-2023 Global Environmental and Social Impact Reports, Jt.App.1614, R.Doc.39-49, 1; Jt.App.682, R.Doc.39-24, 1; Jt.App.987, R.Doc.39-29, 1; Jt.App.1070, R.Doc.39-31, 1.

in Missouri, or any fact suggesting a discriminatory impact on Starbucks' Missouri workforce. As the district court held, without such allegations the Attorney General cannot establish standing or state a claim for relief.

The Attorney General now argues the court improperly relied on the cited documents to discount the Complaint's characterizations. But the court's review of the public and referenced documents—which the Complaint cites over 190 times and partially quotes over 130 times—was permitted under well-established case law and eminently reasonable given the Complaint's incorporation by reference and reliance on those materials. The Attorney General's unsupported and counterfactual suggestion otherwise only serves to highlight that her arguments are refuted by the text of the documents she repeatedly cites and purports to represent.

The Complaint's allegations rest primarily on outdated policies that have either expired on their own terms or, as the Complaint acknowledges, were amended prior to the filing of this suit—both of which render those policies irrelevant, as Missouri's facial challenge cannot be based on policies that no longer exist. Even as framed, the alleged facts undermine the Attorney General's labels and arguments. A review of the policies referenced shows Starbucks has not established any quotas or mandatory diversity-growth percentages, and Starbucks does not require executives or other employees to consider any prohibited characteristic in making employment decisions. Starbucks does not link executive compensation to any measure of

minority representation in its retail stores, and it has never doubled, halved, or conditioned executive bonuses on any diversity metric. Starbucks does not segregate employees by race or require racial representatives to speak on behalf of anyone. Rather, Starbucks' employee programs are open to all, and Starbucks has always prohibited all forms of discrimination. Starbucks' commitment to fair hiring practices and equal-employment opportunities is consistently reiterated throughout the documents underlying the Complaint.

## I.  Factual Background

### A.  Starbucks' Operations

Starbucks is a "premier roaster, marketer and retailer of specialty coffee" with operations worldwide. Jt.App.791, R.Doc.39-26, 7. As alleged, Starbucks operates numerous retail stores throughout the United States, including nearly 200 stores in Missouri. Jt.App.14, R.Doc.1, 7 ¶46. As of September 2024, Starbucks employed over 200,000 U.S. workers (referred to as "partners"), including "hundreds, if not thousands, of Missourians." Jt.App.15, 20, R.Doc.1, 8 ¶47, 13 ¶72. The Complaint further alleges hundreds of Missourians apply for employment in Starbucks' Missouri stores or for remote positions. Jt.App.15, 16, R.Doc.1, 8 ¶47, 9 ¶¶51-53. The Complaint does not allege any facts regarding the demographics of Starbucks' Missouri workforce either before or after Starbucks adopted the challenged policies. Nor does the Complaint allege any facts regarding any Missourian who was

purportedly discharged or denied an employment opportunity with Starbucks. Contrary to the Attorney General's assertion, the Complaint does not allege any facts suggesting Starbucks awards "many positions"—or any position—in Missouri based on race.

### B. Starbucks' Inclusion Goals

#### 1. <u>Starbucks' Commitment to Belonging</u>

Starbucks' inclusion goals are reflected in its commitment "to creating environments where everyone is welcome and belongs." 2024 Annual Report/Form 10-K ("2024 Annual Report"), at 4.[2] As highlighted in its 2024 Annual Report, Starbucks is focused on inclusivity, including within its leadership, strives to reach a broad pool of candidates in its recruiting practices, and prioritizes engagement among its partners. *Id.* To do so, Starbucks sought partner feedback and expanded networking and mentorship opportunities for all partners. *Id.* The Complaint does not allege any facts or cite any documents suggesting Starbucks' "belonging" commitment encompasses any ongoing representation targets for Starbucks' U.S. or Missouri partners. Nor does the Complaint allege any facts regarding how that

---

[2] Unlike the other public documents cited, the Attorney General only submitted a one-page excerpt of the 2024 Annual Report. Jt.App.236, R.Doc.39-15, 1. The entire document can be found https://s203.q4cdn.com/326826266/files/doc_financials/2024/ar/Starbucks-Fiscal-2024-Annual-Report.pdf.

commitment influenced Starbucks' policies or practices in Missouri or how any Missourian has been impacted by Starbucks' broadly stated goals.

### 2. Starbucks' Expired Aspirational Diversity-Representation Targets

The Attorney General's allegations rest instead on now-expired aspirational representation targets. Jt.App.22, 23, 26, R.Doc.1, 15, 16, 19 ¶¶85, 89, 104-106. *First*, in October 2020, Starbucks announced an aspiration to reach certain U.S.-wide (not Missouri specific) representation targets by fiscal year 2025, including separate targets for corporate, retail, and manufacturing roles for women and minorities, referred to as Black, Indigenous and People of Color ("BIPOC"). Jt.App.479, R.Doc.39-20, 7; Jt.App.731, R.Doc.39-24, 50. These aspirational representation targets were referenced in Starbucks' 2021-23 documents, with Starbucks noting the Company would strive towards achieving those targets through "broad recruiting parameters" and "inclusive and legally compliant employment practices." Jt.App.792, R.Doc.39-26, 8; Jt.App.1387, R.Doc.39-45, 6; Jt.App.479, R.Doc.39-20, 7. The goals expired as planned at the end of fiscal year 2024 (September 2024), and the Complaint does not allege Starbucks adopted any current overall-representation targets. The Complaint also does not allege any non-conclusory facts or cite any document indicating Starbucks sought to obtain the now-expired targets through discriminatory hiring or promotion practices or established any penalties for failing to meet those targets.

*Second*, as discussed below, prior versions of Starbucks' Leadership Stock Plan ("LSP") for named executives included a modifier linked to whether the company met a multi-year goal for an increase in representation of BIPOC partners at the manager level or above. Jt.App.423, R.Doc.39-19, 72. From 2021-23, the goal sought improvement in BIPOC management representation by 5% over a three-year period, Jt.App.28, R.Doc.1, 21 ¶118; Jt.App.938, R.Doc.39-27, 54; Jt.App.313, R.Doc.39-18, 74, and in 2024, the goal was reduced to a 1.5-2% improvement. Jt.App.430, R.Doc.39-19, 79. The current version of the plan does not include any representation targets. Jt.App.1274, R.Doc.39-33, 70. The Complaint does not allege any facts or cite any documents suggesting Starbucks attempted to meet prior targets through discriminatory decision-making and does not allege any non-conclusory impact from those goals.

### C. Starbucks' Named-Executives' Bonus-Compensation Plans.

The Attorney General's allegations also rely on the structure of Starbucks' named executives' bonus-compensation plans, but the Attorney General misrepresents the operation of those plans as set forth in the cited public documents. Starbucks' Proxy statements describe the compensation structure for Starbucks' six or seven named executives, and shareholders provide an advisory vote and feedback on the compensation plans. *E.g.*, Jt.App.405, R.Doc.39-19, 54; Jt.App.925-26, R.Doc.39-27, 41-42. The Complaint focuses on two components of that

compensation: the Annual Incentive Bonus Plan (Bonus Plan) and the allocation of performance-based restricted stock units ("PRSUs") in the LSP. Both the Bonus Plan and PRSUs are variable and tied to overall business and individual performance. Jt.App.407, R.Doc.39-19, 56. As discussed below, the relevant formulas for determining the bonuses and PRSUs changed throughout the period covered by the cited documents, and many of the features referenced in the Complaint were amended prior to filing. But both plans were always linked primarily to Starbucks' business performance and never operated in the manner suggested by the Attorney General. To the extent diversity factors were considered, they were one of many factors receiving fractional weight in the overall calculation. The plans never provided that any executive's bonus would be doubled or halved based on a diversity metric and never conditioned an executive's bonus on participation in any employee-inclusion program.

1.    **Bonus Plan**

The Bonus Plan is based on the weighted consideration of business metrics and individual-performance factors. Since October 2023, the Bonus Plan has provided that 75% of each named-executive's bonus opportunity is based on Starbucks' business performance. Jt.App.429, R.Doc.39-19, 78. The remaining 25% is tied to each executive's "individual performance against shared goals." Jt.App.1273, R.Doc.39-33, 69. Individual performance is assessed on several

8

"quantifiable business, functional, and cultural" performance factors, including, among others, "goals intended to create a culture of belonging, joy, and sustainability." Jt.App.1273, R.Doc.39-33, 69. The enterprise-wide "belonging" commitment is "for the benefit of all of [Starbucks'] partners (employees), not just those from underrepresented backgrounds." Jt.App.454, R.Doc.39-19, 103. The Bonus Plan does not tie any executive's bonus to the satisfaction of diversity-representation targets, and the Complaint does not allege any facts or cite any document suggesting implementation of the belonging goal has injured anyone in Missouri.

Prior versions of the Bonus Plan varied in the weight given to individual performance and in the factors encompassed in that consideration, but the Plans always gave predominant weight to business performance and financial goals.[3] The

---

[3] The FY 2021 Bonus Plan provided that 50% of the executives' bonus opportunity was based on Starbucks financial and operational performance, and 50% was based on individual performance. Individual performance was broken down, such that, among other factors, 10% overall was based on progress towards company profit goals and 10% was based on shared people-positive goals (including inclusion and diversity goals). Jt.App.299, R.Doc.39-18, 60. The FY 2022 Bonus Plan provided that 50% was based on Starbucks' business performance; 30% was based on individual performance; 10% was based on profit goals; and 10% was based on environmental goals. The individual performance component was further broken down, such that 10% overall was based on individual performance towards shared inclusion-and-diversity goals. Jt.App.929, R.Doc.39-27, 45. The FY 2023 Bonus Plan provided that 70% was based on Starbucks' business performance, and 30% was based on individual performance, with 7.5% overall based on individual performance towards shared inclusion-and-diversity goals. Jt.App.412-15, R.Doc.39-19, 61-64.

prior Bonus Plans incorporated what was referred to as "people positive" factors among the various considerations within the individual-performance component. *Supra* n.3. Those factors included inclusion goals, which considered whether the executive participated in Starbucks' mentorship program, the average score on an inclusive-leadership survey, and the retention rate of BIPOC partners within the executive's chain of command. *Id.* These considerations were valued with several other individual and business performance factors, thus receiving fractional weight overall. *Id.* The Bonus Plan never linked executives' bonuses to Starbucks' satisfaction of the representation targets discussed above or considered those targets in any manner.

### 2. PRSUs

The LSP allocates restricted stock units to Starbucks' named executives as an additional form of compensation. Sixty percent of those units are PRSUs, tied to performance risks measured by business-performance metrics. Jt.App.1255, R.Doc.39-33, 51. The remaining forty percent are time-based restricted stock units. Jt.App.1255, R.Doc.39-33, 51. The LSP does not consider any inclusion goals in allocating stock units.

Prior LSPs for fiscal years 2021-2024 included a potential "talent" or "representation" modifier, which allowed for a 10% increase/decrease in the number of PRSUs awarded depending on the company's progress towards representation

goals for BIPOC partners in management positions. Jt.App.423, 430, R.Doc.39-19, 72, 79. In 2021-23, the goal sought improvement in management representation by 5% over a three-year period, Jt.App.423, R.Doc.39-19, 72; Jt.App.938, R.Doc.39-27, 54; Jt.App.313, R.Doc.39-18, 74, and in 2024, the goal was reduced to a 1.5-2% improvement. Jt.App.430, R.Doc.39-19, 79. The current version of the plan includes no improved-representation targets. Jt.App.1274, R.Doc.39-33, 70.

**D. Starbucks' Mentorship Program and Partner Networks.**

Starbucks launched a mentorship program in 2021, which originally paired BIPOC mentees at the director level with mentors in "senior leadership" (Jt.App.41, R.Doc.1, 34 ¶¶189, 191-92) and has been expanded year over year (Jt.App.42, 43, R.Doc.1, 35, 36 ¶¶197, 199). As described in Starbucks' 2024 Annual Report, the mentorship program is currently "available to all partners" with no eligibility restrictions and has been since at least 2023. 2024 Annual Report, *supra* n.2, at 4. The mentorship program includes one-on-one and group meetings and community events, Jt.App.1620, R.Doc.39-49, 7, and it is designed to increase participants' sense of belonging by creating a supportive environment that allows participants to share experiences, challenges and aspirations. Jt.App.792, R.Doc.39-26, 8.[4] The

---

[4] The Complaint also alleged Starbucks maintained a Diversity Mentorship Program, in which Starbucks' in-house lawyers served as mentors for new lawyers in private practice. *See* Jt.App.42, R.Doc.1, 35 ¶194 n.111. This program does not provide any benefit to Starbucks' employees, Add. at 3 n.6, Jt.App.1639, R.Doc.40, 3 n.6, and the Attorney General does not rely on or reference the program on appeal.

Complaint does not allege any impact in Missouri or on any Missourian from any version of Starbucks' mentorship program.

Finally, Starbucks also seeks to improve its partners' experiences through the allowance of Partner Networks, which "are partner-led groups that bring together people with shared identities and experiences, along with allies." Jt.App.43, R.Doc.1, 36 ¶201. "Partners of represented and underrepresented groups are not only allowed but encouraged to participate fully" in the Partner Networks (Jt.App.47, R.Doc.1, 40 ¶224), which are—and have always been—open to all partners. As of October 2022, Starbucks' partners had created 12 Partner Networks, with multiple branches nationwide, including the cultural groups alleged, the Armed Forces Network, and Disability Advocacy Network. Jt.App.1006, R.Doc.39-29, 20. The Complaint does not allege any facts or cite any document suggesting Partner Networks are imposed by Starbucks or speak on anyone's behalf in interactions with Starbucks' management. The Complaint does not allege any injury in Missouri or to any Missourian from the employee-led Partner Networks.

## II.    Procedural History

The Attorney General filed a Complaint on February 11, 2025, alleging ten counts of discrimination under Title VII, §1981, and the MHRA. Starbucks filed a motion to dismiss under Fed. R. Civ. Proc. 12(b)(1) & (2) and 12(b)(6) for lack of jurisdiction and for failure to state a claim. Jt.App.71, R.Doc.16, 1. In ruling on

12

Starbucks' motion, the court properly considered the facts alleged and the documents cited and quoted throughout the Complaint. *See generally* Add. at 1, Jt.App.1637, R.Doc.40, 1. The court was unable to access the documents through the links provided and ordered the Attorney General to submit copies of the documents she relied on in her Complaint to allow review of the information fairly encompassed within that document. Jt.App.162-63, R.Doc.38, 1-2. The Attorney General complied, filing the cited exhibits with the court on October 28, 2025. Jt.App.164, R.Doc.39, 1.

On February 5, 2026, the district court issued a comprehensive decision, granting Starbucks' motion to dismiss. Add. at 1, Jt.App.1637, R.Doc.40, 1. The court's opinion did not rely on any facts other than those alleged in the Complaint or contained in the relevant public documents, and the court reached several alternative holdings, all independently supporting dismissal. *First*, the court held Missouri does not have Article III or *parens patriae* standing because the Complaint does not allege any non-speculative harm to Missouri, or any Missourian, or any facts that could establish Missouri has a quasi-sovereign interest separate and independent from an identifiable group of Missouri citizens. Add. at 23-33, Jt.App.1659-69, R.Doc.40, 23-33. *Second*, the court held the Attorney General lacks statutory authority to bring the claims alleged because (i) the Complaint does not allege facts that could show Missouri is "aggrieved," as necessary to bring a Title VII claim; (ii) the Complaint

13

does not allege Missouri has a personal stake in any actual or proposed contract at issue, as necessary to bring a §1981 claim; and (iii) the Complaint does not plead any non-speculative harm in Missouri, as required for an MHRA claim. Add. at 33-37, Jt.App.1669-73, R.Doc.40, 33-37.

*Finally*, the court held the Complaint fails to allege facts that could state a claim for relief. Add. at 37, Jt.App.1673, R.Doc.40, 37. The court concluded (i) the Complaint does not allege Starbucks engaged in any adverse employment action that resulted in concrete harm to a term or condition of employment or employment opportunity, as necessary for a claim of unlawful hiring, firing, or discriminatory practices (Counts 1 & 2), unlawful segregation/classification (Counts 6 & 7) or a §1981 claim (Count 10), Add. at 37-42, Jt.App.1673-78, R.Doc.40, 37-42; (ii) the Complaint does not allege any facts suggesting Starbucks aided and abetted someone to unlawfully discriminate (Count 3), Add. at 43, Jt.App.1679, R.Doc.40, 43; (iii) the Complaint does not allege an unlawful training program because the Partner Networks and the mentorship program are open to all partners, and there is no allegation those programs injured any Missourian (Counts 4 & 5), Add. at 44-45, Jt.App.1680-81, R.Doc.40, 44-45; and (iv) the Complaint does not allege any facts that could establish an unlawful publication (Counts 8 & 9), Add. at 45-46,

Jt.App.1681-82, R.Doc.40, 45-46.[5] While the Attorney General did not clarify below whether the Complaint alleged facial or as-applied challenges, the court explained that discrimination could not be inferred from the adoption of the challenged policies alone, and there were no allegations as to how any of the policies had been enforced in an unlawful manner. Add. at 27-28, Jt.App.1663-64, R.Doc.40, 27-28.

The Attorney General filed a timely notice of appeal on February 12, 2026. Jt.App.1685; R.Doc.44, 1.

## SUMMARY OF THE ARGUMENT

As the district court held, Missouri's claims challenging Starbucks' inclusion initiatives and employee programs under Title VII, §1981 and the MHRA fail. *First*, the Attorney General cannot establish standing to bring federal claims. The Complaint does not allege any non-conclusory harm to any Missourian from the challenged policies and, therefore, fails to plead the required injury-in-fact for Article III standing. Even if it did, the Attorney General cannot establish the alleged *parens patriae* standing because she has not pled any injury to Missouri's quasi-sovereign interests—separate from those of individual citizens—that threatened widespread harm to Missouri's general population.

---

[5] The Attorney General does not appeal the court's ruling with respect to Counts 8 and 9.

*Second*, the Attorney General lacks statutory authority to bring the claims pled. Title VII's comprehensive enforcement scheme does not authorize private actions by state attorneys general, and the Attorney General's attempt to classify Missouri as a "person claiming to be aggrieved" is inconsistent with the language and structure of the statute and Supreme Court case law. Even if Missouri could be deemed a "person aggrieved," the Attorney General failed to satisfy the administrative-exhaustion requirements necessary for any suit.

Missouri's §1981 claim is similarly unauthorized. A plaintiff can bring a claim for alleged contract impairment under that statute only if the plaintiff is suing to protect its own personal rights under an existing or proposed contract. Neither Missouri, nor the general population the Attorney General seeks to represent, have any alleged contract rights purportedly harmed by Starbucks' policies.

The Attorney General also fails to allege an MHRA claim within the statutory authorization. The MHRA authorizes the Attorney General to bring a claim for "preventive relief" in an "appropriate state court" for an alleged "pattern or practice" of MHRA violations. Any alleged violation must be based on conduct that caused an injury in Missouri because the statute does not apply extraterritorially. The Attorney General's suit was filed in federal court, raises a facial challenge to Starbucks' national policies, and fails to allege any non-conclusory harm in Missouri, much less

16

a pattern or practice. The Attorney General's claims therefore fall outside her enforcement authority.

*Third*, the Complaint fails to plead facts that could state a plausible claim for relief. The Attorney General argues Starbucks' policies and practices are facially invalid. But as alleged and described in the cited documents, none of the policies or practices expressly requires consideration of race or gender in determining any employment decision or any term or condition of employment. That failure is fatal to any facial challenge, and the Attorney General does not allege any facts regarding how the policies were implemented or applied. The Attorney General also cannot state an MHRA aiding-and-abetting claim because the Complaint does not allege any discriminatory conduct by another that Starbucks purportedly assisted or incited (or attempted to do so). The Complaint similarly fails to allege any conduct by Starbucks that violated the MHRA, but, even if it did, Starbucks cannot aid and abet its own conduct. Finally, the Complaint does not plead a plausible claim based on any alleged unlawful training program or segregation because the description of the policies in the Attorney General's own referenced documents shows Starbucks' mentorship program and voluntary employee-led Partner Networks are open to all employees.

## ARGUMENT

## STANDARD OF REVIEW

The district court's ruling granting Starbucks' motion to dismiss for lack of subject-matter jurisdiction is reviewed *de novo*, and the plaintiff bears the burden of establishing standing to bring a claim in federal court. *Agred Foundation v. U.S. Army Corps of Eng'rs*, 3 F.4th 1069, 1073 (8th Cir. 2021). The plaintiff "must allege sufficient facts to support a reasonable inference that it can satisfy the elements of standing." *Sch. of the Ozarks, Inc. v. Biden*, 41 F.4th 992, 997 (8th Cir. 2022).

The district court's ruling granting Starbucks' motion for failure to state a claim is also reviewed *de novo*. *Glick v. Western Power Sports, Inc.*, 944 F.3d 714, 717 (8th Cir. 2019). A court "accept[s] as true all factual allegations," but it "need not accept as true a plaintiff's conclusory allegations or legal conclusions drawn from the facts." *Id.* (citation omitted). In ruling on a Rule 12(b)(6) motion to dismiss, a court "may consider the pleadings themselves, materials embraced by the pleadings, exhibits attached to the pleadings, and matters of public record." *Illig v. Union Elec. Co.*, 652 F.3d 971, 976 (8th Cir. 2011) (cleaned up). Contrary to the Attorney General's assertion, a court need not find "beyond doubt" there is "no set of facts" that would entitle the plaintiff to relief. *Bell Atlantic v. Twombly*, 550 U.S. 544, 562-63 (2007). Rather, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. … Threadbare

recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Glick*, 944 F.3d at 717 (cleaned up).

## I.     Missouri Does Not Have Standing.

The Attorney General's claims fail at the threshold inquiry because she cannot establish standing to pursue the alleged federal claims in federal court. Under Article III, a federal court has subject-matter jurisdiction over an action only if the plaintiff can demonstrate the "irreducible constitutional minimum" for standing. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (cleaned up). This requires a plaintiff to clearly allege facts showing (1) a concrete and particularized injury-in-fact, (2) traceable to the defendant's alleged conduct, and (3) redressable by a favorable decision. *Id.* at 338-39. When, as here, a state seeks to bring claims in federal court in its representative *parens patriae* capacity, the state must also demonstrate the alleged conduct threatens the state's own quasi-sovereign interest and impacts a significant portion of the state's population. *Snapp*, 458 U.S. at 607. The Attorney General fails to satisfy either standard.

### A.     The Attorney General Has Not Alleged a Concrete Injury-in-Fact.

First, the Attorney General cannot satisfy even the basic requirements of Article III standing because the Complaint does not allege a concrete and particularized injury-in-fact. As the Supreme Court has recognized, a hypothetical injury is not enough to support standing; a plaintiff must demonstrate "actual or

19

imminent" harm. *Spokeo*, 578 U.S. at 339. While a state may be able to make this showing through allegations of injuries to its citizens, the Complaint fails even this minimal test. The district court properly recognized this, explaining: "Plaintiff failed to allege that any actual Missouri residents applied for an open position in Missouri and were rejected, were passed over for promotion, were disciplined or demoted unfairly, or tried and failed to take advantage of any other benefit of employment with Defendant because of a protected characteristic." Add. at 28, Jt.App.1664, R.Doc.40, 28. In short, the Complaint does not allege any concrete injury to *anyone* in Missouri from Starbucks' policies.

The Attorney General cannot point to any allegation otherwise, and her attempt to do so relies on conclusory and speculative harm. The Attorney General argues that Starbucks' policies impacted thousands of Missourians. But the facts alleged in the Complaint state only that Starbucks:

- "has nearly 200 locations in Missouri";

- "employs, hundreds, if not thousands, of Missourians";

- "receives employment applications from hundreds more"; and

- had "234 job openings" as of January 13, 2024, along with an unidentified number of remote positions.

Jt.App.14-15, 16; R.Doc.1, 7-8, 9 ¶¶46-47, 51-52. But alleging that Starbucks employs Missourians is not the same as alleging that Starbucks has injured

Missourians. The Complaint's only reference to *injury* is devoid of facts and relies on the conclusory allegation that "Starbucks' policies harm the many Missourians whom work, or would like to work, at Starbucks, but have been, are being, or will be discriminated against as future victims on the basis of their race, sex, or inclusion in other protected groups." Jt.App.17, R.Doc.1, 10 ¶56. This allegation does nothing more than restate the required element and speculate as to possible harm. That is not enough. *Spokeo*, 578 U.S. at 339.

The Attorney General's "competing-on-equal-footing" argument fares no better. The Attorney General argues she pled a sufficient injury-in-fact because the Complaint alleges a segment of Missouri's population is being denied the opportunity to compete on equal footing. But the Complaint alleges no such facts. Leaving aside legal conclusions and speculative labels, the Complaint does not allege any ongoing policy or practice that prevents anyone from competing on equal footing. As described in the referenced documents, Starbucks does not mandate or incentivize the consideration of race or gender in any employment decision and does not exclude anyone from any employment opportunity. *Supra*, Sections I(B)-(D). And, the Complaint does not allege how any current or prior policy impacted any employment decision in Missouri or plead any facts regarding how the policies have been interpreted, implemented, or applied. The Attorney General's assumption that Starbucks—contrary to its stated policies—must have engaged in unlawful

21

discrimination is pure speculation and cannot demonstrate the requisite "actual or imminent" injury-in-fact necessary for standing. *Spokeo*, 578 U.S. at 339.

### B. The Complaint Does Not Allege Facts that Could Establish *Parens Patriae* Standing.

#### 1. A State Must Allege an Injury to a Quasi-Sovereign Interest that Threatens a Concrete and Widespread Impact on its General Population.

Even if the Attorney General had pled enough to satisfy the constitutional minimum, she fails to allege the necessary facts to support *parens patriae* standing.[6] *Parens patriae* standing allows a state to bring a representative suit to protect the interests of the state at large. Because such a suit is brought on behalf of a state's citizens generally, the state must allege an injury to its own distinct interest in protecting its population that goes beyond the injuries to individual citizens. Thus, a state must show: (i) an alleged injury to a concrete "quasi-sovereign interest" that is separate and independent from the interests of an identifiable group of private

---

[6] Amici suggest there are no additional requirements for *parens patriae* standing. *See* Amicus Br. by Florida and 19 States. That argument ignores the Supreme Court's discussion in *Snapp*, 458 U.S. at 607-09, which addresses at length what must be shown. The district court properly analyzed whether Missouri had made that requisite showing, Add. at 24-33, Jt.App.1660-69, R.Doc.40, 24-33, and the court's approach is consistent with the accepted view that, absent a statute authorizing *parens patriae* suits, *Snapp's* <u>additional</u> requirements must be satisfied. *E.g.*, *Missouri ex rel. Koster v. Harris*, 847 F.3d 646, 651 (9th Cir. 2017); *Gov't of Manitoba v. Bernhardt*, 923 F.3d 173, 178 (D.C. Cir. 2019); *Harrison v. Jefferson Parish Sch. Bd.*, 78 F.4th 765, 772 (5th Cir. 2023).

22

citizens; and (ii) an impact on a sufficiently substantial segment of the state's population. *Snapp*, 458 U.S. at 607. *Parens patriae* standing does not allow a state to bring suit where it is no more than a nominal party pursuing claims on behalf of private citizens, and courts have refused to recognize such standing if the aggrieved individuals could sue to protect their own interests and seek the same relief.[7] *Id.*; *see also Pfizer, Inc. v. Lord*, 522 F.2d 612, 616 (8th Cir 1975) (quasi-sovereign interests are "interests apart from those of particular individuals who may be affected"); *Missouri ex rel. Koster v. Harris*, 847 F.3d 646, 652-53 (9th Cir. 2017) (no *parens patriae* standing where aggrieved party can bring private suit for full relief); *Paxton v. Dettelbach*, 105 F.4th 708, 715 (5th Cir. 2024) (State lacked quasi-sovereign interest in challenging firearm regulation because it did not have an interest "in addition to and apart from" the interests of private parties).[8]

---

[7] Based on a single line in *Snapp*, *a*mici argue Missouri's anti-discrimination statute, alone, is enough to establish *parens patriae* standing. Amicus Br. by Rick Brattin and Six Missouri State Legislators, at 6-7 (citing *Snapp*, 458 U.S. at 607). *Snapp* never suggested such an expansive view, and it ignores the Court's entire discussion and explanation of the standing requirements. States cannot manufacture standing to enforce a federal statute in federal court simply by passing their own legislation. Rather, *Snapp* held the alleged injury must be sufficiently concrete and widespread to implicate the state's own independent interests in protecting its population generally. 458 U.S. at 607-08. Missouri alleges no such injury here.

[8] *See also Harrison*, 78 F.4th at 772-73 (Louisiana's interest in challenging constitutionality of school policy was derivative of residents' interests and could not support standing); *Navajo Nation v. Wells Fargo & Co.*, 344 F. Supp. 3d 1292, 1311-13 (D.N.M. 2018) (Nation failed to allege facts showing injury separate from interests of individuals allegedly subject to fraud or discrimination).

Thus, it is not enough for a state to allege a violation of federal law potentially impacting some of its residents. A state must allege the challenged conduct injured an interest of the state itself—setting aside the interests of affected citizens—such as an effect on the state's economy or the general health or well-being of its population, as long as the alleged harm is sufficiently concrete and widespread. *Snapp*, 458 U.S. at 602-08. While injuries to "quasi-sovereign interests" are not susceptible to exact definition, they typically include claims for nuisances, widespread economic harm or health risks, or out-of-state discrimination against a state's businesses or citizens. *Id.*; *Missouri ex rel. Bailey v. People's Republic of China*, 90 F.4th 930, 939 n. 2 (8th Cir. 2024) (harms based on COVID pandemic); *Harrison*, 78 F.4th at 772-73 (classic examples include out-of-state nuisances and discriminatory economic policies); *Navajo Nation v. Wells Fargo & Co.*, 344 F. Supp. 3d 1292, 1311 (D.N.M. 2018) ("Examples of quasi-sovereign interests include abating a public nuisance, preventing environmental pollution, or avoiding economic damage of such severity and pervasiveness that it causes injury not only to individual citizens, but to the welfare, prosperity, and economic standing of the State as a whole.").

*Snapp* is illustrative. The Court held Puerto Rico had *parens patriae* standing to challenge Virginia apple growers' refusal to hire its citizens as seasonal workers based solely on the fact that the workers were from Puerto Rico. 458 U.S. at 609. Specifically, the Court held Puerto Rico had a quasi-sovereign interest in protecting

its citizens from the evils of discrimination, noting that Puerto Rico, like any state, had an interest in preventing "invidious discrimination based on state lines." *Id.* The Court further found that while only a "small number," 700-plus citizens, were directly impacted by the alleged discrimination, *id.* at 599, the conduct indirectly harmed a substantial segment of the population because the discrimination stigmatized Puerto Rico's entire labor force as inferior. *Id.* at 609. Finally, the Court found the alleged discrimination denied Puerto Rico's citizens, generally, the opportunity to participate in the federal-employment program, and Puerto Rico had *parens patriae* standing to ensure its citizens received the full benefits of federal law. *Id.* at 609-10.

> **2. Missouri has not alleged Starbucks' policies injured a quasi-sovereign interest or substantial number of Missourians.**

Applying *Snapp*, the district court properly held Missouri failed to establish *parens patriae* standing. Add. at 24-33, Jt.App.1660-69, R.Doc.40, 24-33. *First*, the Complaint does not allege facts demonstrating Missouri's *own* concrete and independent interest, distinct from the interests of individual citizens. At most, the Complaint alleges Starbucks adopted policies that may have had an unpled impact on an unknown number of Missouri workers or applicants at unidentified Missouri Starbucks locations. The Complaint does not allege—and the Attorney General does not explain—how such allegations suggest a widespread threat or injury to Missouri's population. They do not. Rather, this is a quintessential example of a suit

where the state's interests are no different than those of an identifiable group of citizens—certain individuals seeking employment or opportunities within their employment with Starbucks. If individuals in Missouri believe Starbucks has discriminated against them, they can bring their own suits under federal discrimination laws. And individual discrimination suits can pursue the same injunctive relief sought by Missouri here. *E.g.*, *People of NY by Abrams v. Holiday Inns, Inc.*, 656 F. Supp. 675, 678 (W.D.N.Y. 1984) (individual discrimination suits can seek broad injunctive relief).

*Second*, the Complaint does not allege harm to a substantial segment of Missouri's population. The Complaint does not include any allegations as to how Starbucks' policies have been implemented in Missouri, and it does not identify any individual purportedly harmed. The Attorney General's suggestion that the policies have resulted in discriminatory employment decisions in all of Missouri's Starbucks stores that impacted all of Missouri's Starbucks employees and applicants is speculative and implausible. Conclusory assertions of a statewide impact, without any supporting fact allegations, cannot establish *parens patriae* standing. *E.g.*, *Harris*, 847 F.3d at 652-53 (no allegations as to statewide magnitude or extent to which more than an identifiable group was affected); *In re Packaged Seafood Prods Antitrust Litig.*, 338 F. Supp. 3d 1079, 1096-97 (S.D. Cal. 2018) (conclusory allegation that citizens overpaid for tuna was insufficient and state did not allege

26

facts regarding extent of injury to population). It is impossible to determine the alleged conduct impacted a sufficiently substantial segment of Missouri's citizens when the state "has not alleged facts about *any* proportion of its population." *In re Packaged Seafood Prods.,* 338 F. Supp. 3d at 1096.

While courts also consider indirect injuries, the Attorney General has not alleged any actual or imminent injury to Missouri's society or economy generally. The alleged conduct does not pose a generalized health or environmental hazard, or reduce the availability of goods or services, or impact Missouri's overall economy.[9] And, unlike *Snapp*, Starbucks' alleged conduct does not stigmatize Missourians generally or limit economic opportunities for Missourians vis-à-vis citizens from other states. Rather, the Complaint alleges, without facts, that some Missourians were favored over other Missourians based on characteristics that have nothing to do with Missouri. The Complaint does not—and cannot—allege how that purported conduct impacts Missouri's society or economy in a concrete and widespread manner.

---

[9] The Complaint alleges the purported employment discrimination leads to the hiring of unqualified workers which leads to poorer service and quality in Starbucks' stores in Missouri. Jt.App.18-19, R.Doc.1, 11-12 ¶¶63-68. The district court rightly rejected those allegations as implausible and conjectural. Add. at 29-30, Jt.App.1665-66, R.Doc.40, 29-30. The Attorney General does not rely on those allegations in her brief.

**3.** *Snapp* **did not establish an exception for discrimination suits.**

Relying on *Snapp*, the Attorney General argues Missouri's interest in ending the societal evils associated with discrimination supports *parens patriae* standing, but that argument ignores *Snapp's* factual context and discussion of the standing requirements. In applying the principles discussed above, *Snapp* began by recognizing that a state's interest in the well-being of its populace included an interest in protecting citizens from the "political, social, and moral damage of discrimination." 458 U.S. at 609. But the Court then focused on the specific nature of the claimed discrimination to find the alleged harm was the type of widespread injury to Puerto Rico as a whole that could support *parens patriae* standing. *Id.* The Court explained that the ethnic discrimination against Puerto Ricans resulted in discrimination "based on state lines" and concluded that "a State could seek, in the federal courts, to protect its residents from *such* discrimination to the extent it violates federal law." *Id.* (emphasis added). The Court added that "deliberate efforts to stigmatize the labor force as inferior carry a universal sting." *Id.* Those observations were not about abstract discrimination—it was Puerto Rico's general labor force that was characterized as "inferior" and Puerto Ricans generally who were stigmatized and denied opportunities provided to other states' citizens solely because they were Puerto Ricans.

28

The Attorney General's contrary interpretation suggests *Snapp* set forth the applicable test for *parens patriae* standing but then created an automatic exception for discrimination suits. *Snapp* does no such thing. The Court was careful to explain why the alleged discrimination went beyond an abstract harm and threatened the type of widespread injury that could satisfy the identified standing requirements. *Snapp's* requirement that a state demonstrate an interest beyond those of an identifiable group of citizens makes no sense if the state can bring a *parens patriae* suit based on any type of alleged discrimination against any of its citizens.

The Attorney General's approach also would open the door to *parens patriae* standing to enforce virtually every federal law. Anti-discrimination laws are not unique—all federal statutes are based on the determination that the law furthers the public good in some manner, and they all seek to prevent societal evils or provide societal benefits. When viewed in the abstract, those evils or benefits are all connected to a state's interest in protecting the physical or economic well-being of its citizens. But *Snapp* did not recognize *parens patriae* standing to enforce every federal law. Nor does Congress presume such standing exists, as it has added express authorizations for *parens patriae* suits to a number of federal statutes. *E.g.*, 15 U.S.C. §15c; *id.* §2073(b)(1); *id.* §6504. Those authorizations would be superfluous if

*parens patriae* standing already exists to enforce any violation of law that impacts the health or well-being of a state's citizens in some general manner.[10]

The district court's rejection of the Attorney General's expansive interpretation does not impede the rightful role of state attorneys general. Nothing in the district court's opinion interferes with the Attorney General's ability to perform her predominant role—to enforce Missouri law in Missouri courts. Absent legislation providing otherwise, there is no special role for state attorneys general in enforcing federal statutes. To the extent such enforcement is authorized or needed to protect Missouri's population generally, such standing is permitted under the district court's careful analysis. The fact that the Complaint fails to plead any facts to support such standing here does not prevent the Attorney General from bringing *parens patriae* suits to address threats of widespread harm to Missouri's population.

---

[10] There is no merit to the Attorney General's argument that the district court's decision calls into question the constitutionality of these statutory authorizations. The requirements for *parens patriae* standing generally are viewed as prudential standing requirements. *E.g.*, *Estados Unidos Mexicanos v. DeCoster*, 229 F.3d 332, 335-36 (1st Cir. 2000); *Arizona v. Garland*, 730 F. Supp. 3d 258, 275-76 (W.D. La. 2024); *In re Electronic Books Antitrust Litig.*, 14 F. Supp. 3d 525, 534-35 (S.D.N.Y. 2014); *State v. Nelson*, 576 F. Supp. 3d 1017, 1028 (M.D. Fla. 2021); *Bernhardt*, 923 F.3d at 178 (*parens patriae* requirements are in addition to Article III requirements); *Harris*, 847 F.3d at 651(same). "Congress may, by legislation, expand standing to the full extent permitted by Art. III, thus permitting litigation by one who otherwise would be barred by prudential standing rules." *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 100 (1979).

Nor is the district court's decision contrary to established standing principles. Quite the opposite—the court's holding follows directly from *Snapp's* analysis. It is also consistent with courts across the country that have applied *Snapp* faithfully, noting the discrimination at issue was based on state citizenship and, therefore, had a broader impact on the society and population generally. *Harris*, 847 F.3d at 655 (noting nature of discrimination in *Snapp* affected all Puerto Ricans so Puerto Rico could seek relief for its residents under *parens patriae* theory); *Paxton*, 105 F.4th at 715 (*Snapp* "concerned efforts to stigmatize the *entire* Puerto Rican labor force and therefore implicated the economic interests of Puerto Rico itself"); *Navajo Nation*, 344 F. Supp. 3d at 1311 (in *Snapp*, injunction sought to remedy discrimination that resulted in "universal sting" of Puerto Rican labor force being considered inferior).

The Attorney General's argument otherwise primarily relies on cases from courts within the Second Circuit, mostly New York district-court decisions from the 1990s.[11] The few Second Circuit decisions cited do not establish the broad

---

[11] *See, e.g.*, Appellant's Brief ("Aplt. Br."), 5 n.1 (citing cases). The few cases cited from outside the Second Circuit either do not address or analyze the issue, rely wholly on the New York cases, or were issued before *Snapp. See Civil Rights Dep't v. Grimmway Enters.*, 800 F. Supp. 3d 1084, 1103 (E.D. Cal. 2025) (addressing whether state had to satisfy Rule 23 class-action requirements in representative action; did not discuss *Snapp*); *Aziz v. Trump*, 231 F. Supp. 3d 23, 32 (E.D. Va. 2017) (no analysis); *Mass. v. Bull HN Info. Sys.*, 16 F. Supp. 2d 90, 98-102 (D. Mass. 1998) (relied on cases from within Second Circuit); *Com. of Pa. v. Porter*, 659 F.2d 306 (3d Cir. 1981) (pre-*Snapp*); *Com. of Pa. v. Flaherty*, 547 F Supp. 172, 174 (W.D. Pa. 1982) (pre-*Snapp* determination of *parens patriae* standing in litigation); *Com. of Pa. v. Glickman*, 370 F. Supp. 724 (W.D. Pa. 1974) (pre-*Snapp*).

discrimination exception the Attorney General claims: (1) *New York v. Griepp*, 991 F.3d 81 (2d Cir. 2021), relied on throughout the Attorney General's brief, has been vacated, 11 F.4th 174, 176 (2d Cir. 2021); the decision was replaced on rehearing with an opinion that does not address the issue of *parens patriae* standing, *id.*; (2) *People by Abrams v. 11 Cornwell Co.*, 695 F.2d 34, 38-40 (2d Cir. 1982), allowed a *parens patriae* suit challenging the defendants' refusal to sell property *to the state* that impacted the state's ability to care for disabled citizens and the cost of that care; and (3) *NY by James v. Niagara-Wheatfield Cent. Sch. Dist.*, 119 F. 4th 270, 279-83 (2d Cir. 2024), considered only whether the alleged conduct impacted a substantial segment of the population; the defendant did not contest the other *parens patriae* requirements. To the extent any of the decisions cited suggest *Snapp* authorizes *parens patriae* standing for all suits alleging any type of discrimination, they are unpersuasive for the reasons discussed above and in the district court's opinion. Add. at 32-33, Jt.App.1668-69, R.Doc.40, 32-33; *Wyatt Bury, LLC v. Kansas City*, 804 F. Supp. 3d 939, 965 n.11 (W.D. Mo. 2025).

## II.     The Attorney General Lacks Statutory Authority to Pursue the Claims Pled.

### A.     Title VII Does Not Authorize Suits by State Attorneys General.

The Attorney General asks this Court to write into Title VII both a broad grant of enforcement authority and an exception to the administrative-exhaustion

requirement, where Congress included neither in the statute's carefully crafted scheme. *Foster v. Wyrick*, 823 F.2d 218, 221 (8th Cir. 1987) (noting Title VII's "comprehensive remedial system" to enforce statute); *Brown v. Gen. Servs. Admin.*, 425 U.S. 820, 832 (1976) (noting "balance, completeness, and structural integrity" of Title VII's remedial provisions). The Attorney General argues Title VII grants states expansive authority to enforce Title VII as a "person claiming to be aggrieved," 42 U.S.C. §2000e-5(f)(1), because Title VII's definition of "person" includes "governments."[12] *Id.* §2000e(a). The Attorney General's interpretation is untenable under controlling precedent and the statute's plain text and purpose.

*First*, noting that "person" includes "governments" does not resolve the relevant issue because it does not address whether states, suing *parens patriae*, are "claiming to be aggrieved" as understood under Title VII.[13] Discussing that provision, the Supreme Court held "a plaintiff may not sue unless he falls within the zone of interests sought to be protected by [the statute]," and "the purpose of Title

---

[12] The Attorney General does not cite the provision authorizing private suits by "person[s] claiming to be aggrieved." Instead, she cites only §2000e-5(b), which sets out the administrative-exhaustion procedures she did not even attempt to satisfy.

[13] Title VII uses "persons" separately from "persons aggrieved," particularly when discussing liability. *E.g.*, 42 U.S.C. §2000e-6(a) (" ... person or group of persons [] engaged in a pattern or practice "); 42 U.S.C. §2000e-7 ("Nothing in this subchapter shall be deemed to exempt or relieve any person from any liability...."). These references include state governments, which can be liable for Title VII violations; it does not follow that use of the modified term "aggrieved person" also must include state governments. Holding otherwise would read "aggrieved" out of the statute.

VII is to protect employees from their employers' unlawful actions." *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 177, 178 (2011) (cleaned up). The district court applied *Thompson*, explaining that "'persons aggrieved' . . . does not include state attorneys general attempting to shoehorn the complaints of private citizens into their own cause of action against a private employer." Add. at 34, Jt.App.1670, R.Doc.40, 34. The Attorney General can only sue *parens patriae* to protect interests which are separate from, and independent of, the interests of Starbucks' employees and applicants. Even if this Court were to find the Attorney General has standing, such a finding necessarily would mean any alleged harm to the State falls beyond Title VII's protected "zone."

The Attorney General cites two district court decisions to support her contrary interpretation of "persons aggrieved," but neither supports reversal. The first, *EEOC v. FedEx*, 268 F. Supp. 2d 192 (E.D.N.Y. 2003), was decided before *Thompson*, relied on a decision expressly rejected in *Thompson*, and concluded New York could bring suit under Title VII because a "government" is a "person," without analyzing whether the State was "aggrieved." 268 F. Supp. 2d at 197, 198 n.4 (relying on *Hackett v. McGuire Bros., Inc.*, 445 F.2d 442 (3d Cir. 1971)); *Thompson*, 562 U.S. at 176 (rejecting *Hackett*'s language as "too expansive"). The second, *Civil Rights Department v. Grimmway Enterprises*, 800 F. Supp. 3d 1084 (E.D. Cal. 2025), was an ADA decision that relied heavily on *FedEx* and was internally inconsistent. The

34

court found the State fell within the ADA's "zone of interests" because the ADA "aims to ... protect the state's role in addressing unlawful discrimination," but the court simultaneously recognized that the "state's role" under the statute does not include filing private civil actions. 800 F. Supp. 3d at 1103 (statute "requir[es] that state and local authorities be given time to address unlawful employment practices through state or local law before the EEOC or individuals may bring suit").

The Attorney General's reliance on *Clayton v. White Hall School Dist.*, 875 F.2d 676 (8th Cir. 1989), is similarly misplaced. There, the plaintiff alleged the racially discriminatory environment "caused her severe emotional and psychological distress," even though she was not the target of the discrimination. *Id.* at 679. Thus, the plaintiff—an employee of the allegedly discriminating employer—asserted a personal injury caused by an alleged Title VII violation in her own workplace. The Court held such an injury was within Title VII's zone of interests. *Id.* at 680. Missouri did not, and cannot, allege any comparable injury.

Moreover, the Attorney General's interpretation is inconsistent with Title VII's comprehensive framework. Title VII expressly contemplates a specific role for states in combatting employment discrimination—through the enforcement of the *states' own laws*. To further that enforcement, Title VII grants states exclusive authority, for a sixty-day period, to investigate charges of discrimination under the state's law "prohibiting the unlawful employment practice alleged." 42 U.S.C.

§2000e-5(c). If Congress intended states to investigate and pursue charges under Title VII as well, it clearly could have authorized such actions but chose not to do so.

Rather, the statute explicitly tasks two different government entities with enforcement of Title VII—the EEOC and the U.S. Attorney General—and identifies the scope of that authority and the procedures to be followed. 42 U.S.C. §§2000e-5(b), (f)(1). Both of those entities—like states—are "person[s]" within Title VII's definition. Under the Attorney General's argument, the EEOC and U.S. Attorney General would also be "person[s] claiming to be aggrieved," with the right to bring a claim as such. But if so, there was no need for Congress to separately grant them enforcement authority and delineate its parameters, and the provisions doing so, §§2000e-5(b) and (f)(1), would be wholly superfluous. *Cody v. Hillard*, 304 F.3d 767, 776 (8th Cir. 2002) ("[C]ourts should not interpret one provision 'in a manner that renders other sections of the same statute inconsistent, meaningless, or superfluous.'" (citation omitted)).

The Attorney General's interpretation not only adds an extra-textual authorization for state suits, she effectively argues states have broader enforcement rights than *any other person*—including the government entities expressly entrusted to enforce the statute. Title VII requires the EEOC, U.S. Attorney General, and "person[s] claiming to be aggrieved" to comply with designated procedural-

exhaustion requirements before filing civil actions. §2000e-5(f)(1) (allowing authorized actions only after investigation of charge by EEOC and EEOC's failure to enter conciliation agreement with respondent). The Attorney General, however, made no attempt to satisfy those requirements[14] and argued below that the court should excuse her from doing so as "futile" because the process was not designed for states' suits. Jt.App.118, R.Doc.27, 18 (arguing EEOC's administrative process only applies to "individual plaintiffs" and "is not designed for State-led suits"). In essence, the Attorney General argues states alone have the authority to bring a Title VII claim without satisfying the procedures that apply to all other "person[s] claiming to be aggrieved" and entities with express enforcement authority. The absurdity of that position only underscores the fact that Congress did not design Title VII with the intent of authorizing states to sue as "aggrieved persons."

Rather than assume Title VII's comprehensive enforcement scheme somehow includes an implied grant of authority and an implied exemption from express procedural requirements, the Court should enforce the statute's plain terms, which do not authorize the Attorney General's Title VII claims.

**B.      The Attorney General Cannot Bring a Claim Under §1981.**

---

[14] Even if the Attorney General is considered to be a "person aggrieved," her Title VII claims should be dismissed for this failure to exhaust. 42 U.S.C. §2000e-5(f)(1).

Section 1981 does not authorize a state attorney general to bring a claim for alleged discrimination against some of its citizens, and the Attorney General's contrary arguments confuse statutory authority with *parens patriae* standing and mischaracterize both. Section 1981 provides that all people "shall have the same right… to make and enforce contracts… as is enjoyed by white citizens …" and authorizes a claim when racial discrimination is a "but-for" cause of the loss of legally-protected contractual rights. 42 U.S.C. §1981; *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 341 (2020). It is not a general anti-discrimination statute. Rather, §1981 only authorizes an action by a plaintiff who "has or would have rights under the existing or proposed contractual relationship," either a party or a third-party beneficiary. *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006). It does not authorize derivative claims, *id.*; *FCS Advisors, LLC v. Missouri*, 929 F.3d 618, 621 (8th Cir. 2019). Missouri has not alleged Starbucks' policies impaired any of its own contractual rights.

The Attorney General argues *Domino's* did not abrogate the state's "presumptive authority" to bring a *parens patriae* suit to enforce federal law. But there is no "presumption" a state can enforce federal statutes, and the Attorney General cites no case recognizing that proposition. Indeed, *Snapp's* entire analysis discussed the limits on *parens patriae* standing and the necessary requirements for bringing suits. *Snapp's* understanding of *parens patriae* standing is fundamentally

inconsistent with §1981 and the Supreme Court's explanation of authorized actions under that statute. Contrary to the Attorney General's suggestion, *parens patriae* standing does not allow Missouri to sue as "guardian" of a particular group of citizens and assert the interests of individuals who have (or would like to have) contracts with Starbucks. That type of representative action is expressly prohibited under *Snapp.* Rather, a *parens patriae* suit allows a state to assert its *own* quasi-sovereign interest in protecting its populace from widespread harm, and it represents the state at large. Like Missouri, the general population of the state does not have any contractual rights at stake; proceeding *parens patriae* does not allow Missouri to state a claim under §1981.[15]

### C. The MHRA Claims Pled Are Not Within the Attorney General's Enforcement Authority.

The MHRA authorizes the Attorney General to bring a claim for "preventive relief" in "state court" for an alleged "pattern or practice" of MHRA violations. §213.126.1, RSMo. The Attorney General's facial challenges to Starbucks' national policies brought in federal court do not fall within the scope of that authority.

First, as Starbucks noted below, the Attorney General's MHRA claims fail because the statute expressly authorizes the Attorney General to file a civil action

---

[15]The Attorney General does not cite any persuasive authority holding otherwise. *Glickman*, 370 F. Supp. 724, was decided before *Domino's* (and *Snapp)*, and none of the other decisions discuss §1981.

only in an "appropriate <u>state court</u>." Jt.App.93; R.Doc.17, 17; §213.126.1, RSMo (emphasis added).[16] The MHRA does not authorize the Attorney General's claims in federal court.

Further, the district court correctly held the MHRA authorizes suit by the Attorney General only where the alleged discrimination caused harm in Missouri. In *Tuttle v. Dobbs Tire & Auto Centers*, 590 S.W.3d 307 (Mo. 2019), the Missouri Supreme Court held the MHRA only authorizes claims for discrimination causing an adverse impact in Missouri because the statute cannot be applied extraterritorially. *Id.* at 310-11. The Complaint does not allege facts indicating any Missourian has been harmed or that any allegedly discriminatory conduct has occurred in Missouri. The Complaint's vague and conclusory allegation asserting that Starbucks' policies "harm Missourians" is wholly insufficient under *Twombly* and *Iqbal*. Jt.App.17, R.Doc.1, 10 ¶56. The Attorney General cites nothing else.

The Attorney General also argues she need not identify any actual harm in Missouri because she asserts only a facial challenge. Aplt. Br. 53. But the MHRA only authorizes the Attorney General to bring a suit in state court to challenge a "<u>pattern or practice</u> of resistance to the full enjoyment of any of the rights granted by" the MHRA. §213.126.1, RSMo (emphasis added). A pattern-or-practice claim

---

[16] Notably, the Attorney General's quotation of Section 213.126.1 omits this language. Aplt. Br. 52.

requires proof "the employer regularly and purposefully treated members of the protected group less favorably." *EEOC v. McDonnell Douglas Corp.*, 191 F.3d 948, 951 (8th Cir. 1999) (cleaned up).[17] The pattern-or-practice theory—alleging a series of actual harms to employees caused by systemic discrimination—is distinct from a "facial" theory—challenging a policy itself. *Rialto v. W. Coast Loading Corp.*, 581 F.3d 865, 879 (9th Cir. 2009) (plaintiff framed claim as "a facial challenge to the statute itself, not a 'pattern and practice' claim"); *Gen. Elec. Co. v. Jackson*, 595 F. Supp. 2d 8, 15 (D.D.C. 2009), *aff'd,* 610 F.3d 110 (D.C. Cir. 2010) (distinguishing facial and pattern-or-practice claims); *Raytheon Aircraft Co. v. U.S.*, 435 F. Supp. 2d 1136, 1154-55 (D. Kan. 2006). Thus, the Attorney General's framing of her claims as facial challenges does not allege a pattern-or-practice claim authorized by the statute.

Nor does the Complaint plead any facts that could state such a claim or even purport to do so. The Attorney General fails to identify any employment actions in Missouri, any Missourian harmed by Starbucks' conduct, or any statistical disparity that could support an inference of discrimination in Missouri—much less the type of pervasive discrimination necessary to show a pattern or practice. *Cf. Morgan v. United Parcel Serv.*, 380 F.3d 459, 463 (8th Cir. 2004) (pattern-or-practice

_____

[17] In interpreting the MHRA, Missouri courts rely on federal employment-discrimination case law if consistent with Missouri law. *Barrett v. Cole Cnty.*, 687 S.W.3d 685, 697 (Mo. App. 2024).

allegations typically involve statistical evidence of disparities). Because the Attorney General has not brought a pattern-or-practice claim in state court alleging non-conclusory harm to Missourians, her MHRA claims exceed her statutory authority; the district court's dismissal should be affirmed.

**III.    The Complaint Fails to State a Plausible Claim for Relief.**

**A.    The District Court Properly Considered the Public Documents Referenced in the Complaint.**

The Attorney General argues the district court erred when it ordered her to submit the documents cited in her Complaint and relied on such documents when deciding the motion to dismiss. Aplt. Br. 54. The district court's consideration of public documents, incorporated by reference in the Complaint was proper and was well-supported by this Court's precedent.

As an initial matter, the Attorney General's argument relies on a rejected formulation of the Rule 12(b)(6) standard. Her brief does not once cite *Twombly* or *Iqbal*—the universally recognized leading cases. *Twombly*, 550 U.S. 544; *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). Instead, the Attorney General states the standard as follows: "Dismissal is inappropriate unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."

Aplt. Br. 26.[18] The Supreme Court, however, expressly rejected the "no set of facts" standard in *Twombly* and *Iqbal*. *Twombly*, 550 U.S. at 562-63 ("no set of facts" language was "not the minimum standard of adequate pleading to govern a complaint's survival"); *Iqbal*, 556 U.S. at 670 ("*Twombly* retired the ... no-set-of-facts test").

In doing so, the Supreme Court recognized that standard would allow "a wholly conclusory statement of claim survive a motion to dismiss whenever the pleadings left open the possibility that a plaintiff might later establish some 'set of undisclosed facts to support recovery.'" *Twombly*, 550 U.S. at 561 (cleaned up). The Court condemned this result, as well as the fact that the standard makes "the prospect of unearthing direct evidence ... sufficient to preclude dismissal, even [where] the complaint does not set forth a single fact in a context that suggests" a necessary element of the claim. *Id.* at 561-62. The Attorney General asks this Court to do exactly what the Supreme Court proscribed in *Twombly*—allow her to survive a motion to dismiss based on wholly conclusory allegations and speculation that discovery might reveal facts evincing discrimination.

To that end, the Attorney General argues the district court was required to consider only the Complaint's representations as to the contents of the documents

---

[18] The Attorney General quotes *Ulrich v. Pope Cnty.*, 715 F.3d 1054, 1058 (8th Cir. 2013), which quoted *Hafley v. Lohman*, 90 F.3d 264, 266 (8th Cir. 1996), decided over a decade before *Twombly*.

and to ignore the language in the documents themselves. The Attorney General offers no support for that suggestion. Instead, she argues the cases cited by the district court—all standing for the long-accepted proposition that a court can consider materials referenced in, or attached to, the body of the complaint—are distinguishable because they involved fewer and shorter documents. Aplt. Br. 55; *Gorog v. Best Buy Co.*, 760 F.3d 787 (8th Cir. 2014); *Quinn v. Ocwen Fed. Bank FSB*, 470 F.3d 1240 (8th Cir. 2006); *Silver v. H&R Block*, 105 F.3d 394 (8th Cir. 1997). But the Attorney General offers no explanation as to why a plaintiff's decision to rely on several longer documents somehow alters the well-established rule that a court can consider documents referenced in the complaint when deciding a motion to dismiss. It does not. *See Moses.com Sec. v. Comprehensive Software Sys.*, 406 F.3d 1052, 1063 n.3 (8th Cir. 2005) (court could consider specifically mentioned press release "even though it was not expressly part of the pleadings, because it was incorporated into the pleadings by reference"); *Katun Corp. v. Clarke*, 484 F.3d 972, 975 (8th Cir. 2007); *Illig*, 652 F.3d at 976. Indeed, the District Court could have considered the public documents cited in the Complaint as "matters of public record," even if the Complaint did not expressly reference them. *Illig*, 652 F.3d at 976.

The Attorney General's argument leads to absurd results. The Complaint's only source of information about Starbucks' policies—challenged by the Attorney

General as facially unlawful—is the public documents repeatedly referenced. The Attorney General does not allege any facts regarding the development, communication, implementation, or application of the policies. There is no reasoned basis to suggest a court must accept the Complaint's conclusory labels and characterizations of those documents or rely only on the Attorney General's selective quotations. Just as the Attorney General relied on the cited documents to describe the policies challenged, the district court properly relied on the documents to determine what the policies said. The Attorney General has no support for her attempt to prevent consideration of statements in her own documents that undermine her cherry-picked narrative and fatally deficient claims.

**B.    The Complaint Does Not Allege Any Concrete Harm to an Employment Condition or Opportunity. (Counts 1, 2, 10)**

The district court properly held the Attorney General failed to state a claim under Title VII or the MHRA for "unlawful hiring, firing and discriminatory practices" (Counts 1-2) or for "discriminatory contracting impairment" under §1981 (Count 10) because the Complaint does not allege any concrete harm to a term or condition of employment or employment opportunity. The court explained all three claims require the Attorney General to link Starbucks' policies to some actual adverse employment decision or "some other detrimental change in the terms, conditions, or privileges of employment." Add. at 38, Jt.App.1674, R.Doc.40, 38; 42 U.S.C. §2000e-2(a)(1); §213.055.1(1)(a), RSMo.; *Muldrow v. St. Louis*, 601 U.S.

346, 354-55 (2024); *Collins v. Union Pac. R.R.*, 108 F.4th 1049, 1052 (8th Cir. 2024) (§1981 claim analyzed under same framework as Title VII). The Attorney General argues the court relied on an overly-narrow interpretation of "adverse action," but the argument mischaracterizes the court's analysis. The court's decision did not rest on any concept of materiality or a purported list of possible adverse actions—the court held the Complaint failed to allege facts regarding *any* harm to an employment condition or opportunity. Add. at 39-42, Jt.App.1675-78, R.Doc.40, 39-42. The court concluded the policies alone did not provide the necessary link, and the Complaint does not allege facts regarding the implementation of the policies or any Missourian who was purportedly injured by their application. Add. at 39-42, Jt.App.1675-78, R.Doc.40, 39-42. In short, the Complaint fails to allege the "some harm respecting an identifiable term or condition of employment" required by *Muldrow.* 601 U.S. at 355. The Attorney General does not identify any non-conclusory factual allegation otherwise.

Instead, the Attorney General argues she does not need to allege a particular adverse action because she is raising only a facial challenge, though that position was not made clear below. Regardless, this framing cannot save her claims. A facial challenge is necessarily directed towards the language of the policy alone. *E.g.*, *CMR D.N. Corp. v. Philadelphia*, 703 F.3d 612, 624 (3d Cir. 2013); *Ezell v. Chicago*, 651 F.3d 684, 698-99 (7th Cir. 2011). For claims alleging a facially invalid employment

policy, that language must expressly link the consideration of a prohibited characteristic to employment decisions or opportunities, as illustrated by the Attorney General's own cases. *See Hamilton v. Dallas County*, 79 F.4th 494 (5th Cir. 2023) (different policies for scheduling off days based on gender); *Threat v. Cleveland*, 6 F.4th 672 (6th Cir. 2021) (determined shifts explicitly based on race); *Frank v. United Airlines*, 216 F.3d 845 (9th Cir. 2000) (different weight standards for men and women); *Maitland v. Univ. of Minn.*, 155 F.3d 1013 (8th Cir. 1998) (salary increase for women as part of settlement). Therefore, even if a facial challenge does not need to allege a *specific* injury from the application of Starbucks' policies, the policies themselves must expressly demonstrate how race/gender impacts Starbucks' hiring, firing, or promotion decisions or some other employment condition.

The Attorney General fails to satisfy that burden. For a facial challenge, the claim must be based on the most current version of the policy at issue, as there is no point in challenging the terms of a policy that no longer exists, and any injunctive or declaratory relief would be meaningless.[19] *E.g., Young America's Foundation v.*

---

[19] The Attorney General also argues she is bringing a claim for retrospective damages, Aplt. Br. 17, but that is inconsistent with a facial challenge. *CMR D.N.*, 703 F.3d at 624 (remedy for facial challenge is directed at statute itself and must be injunctive and declaratory); *Ezell*, 651 F.3d at 698-99 (same). The Complaint does

47

*Kaler*, 14 F.4th 879, 886-87 (8th Cir. 2021) (facial challenges to prior university policy are moot; policies are different enough that ruling on old policy would have no effect on new policy); *Turning Point USA at Arkansas St. Univ. v. Rhodes*, 409 F. Supp. 3d 677, 685 (E.D. Ark. 2019) ("When a statute, ordinance or policy has been repealed, a plaintiff's facial challenge to it could remedy nothing …."). The most recent versions of Starbucks' policies do not contain any specific representation targets, and the executive-compensation plans do not incorporate any diversity metrics or talent modifiers. *Supra*, pp. 7, 9, 11. At most, the bonus plan includes consideration of a broadly stated "belonging goal" as one of several factors considered in determining the individual-performance component. *Id.* Nothing in those policies requires the consideration of race or gender, much less demonstrates the requisite link between any such consideration and an employment decision or opportunity.

Even if the Attorney General could rely on Starbucks' outdated policies, her facial challenge would still fail. As discussed, Starbucks' older policies: (i) provided for now-expired aspirational representation goals for the overall U.S. workforce that were never tied to executive compensation; (ii) incorporated some consideration of diversity goals (including a retention goal for BIPOC partners) into the Bonus Plan

---

not allege facts regarding anyone purportedly injured by the application of the policies in any manner.

along with several other factors; and (iii) provided for a 10% modifier to the number of PRSUs awarded based on multi-year improved-representation targets for BIPOC managers. *Supra*, Sections I(B)-(D). None of the policies expressly mandated consideration of race/gender in any hiring, retention, or promotion decision, and none of the policies expressly linked any term or condition of employment to any race- or gender-based factor. Starbucks' company-wide diversity or belonging initiatives, alone, do not support the "broad, and otherwise unsubstantiated leap" that they were the "catalyst" for unlawful employment decisions. *Mangold v. PECO Energy*, 2021 WL 6072818, *17 (E.D. Pa. Dec. 23, 2021).

Failing to show any facially-discriminatory link or allege any facts regarding how Starbucks' policies were communicated or implemented, the Attorney General asks the Court to assume the policies were applied in a discriminatory manner. But that is fundamentally opposed to the nature of a *facial* challenge and contrary to established case law holding diversity initiatives, alone, are not evidence of discrimination. *E.g.*, *McCormick v. Gasper*, 2022 WL 16586621, *4 (6th Cir. Nov. 1, 2022) (policy stating that percentage of positions should be filled by minorities/women did not establish facially discriminatory quotas); *Dzibela v. BlackRock Inc.*, 2024 WL 4349813, *6 (D.N.J. Sept. 30, 2024) (conclusory

allegations of diversity targets failed to raise plausible inference of discrimination).[20] The Attorney General offers nothing more, and Counts 1, 2, and 10 fail to state a plausible claim for relief.

**C.      The Complaint Does Not Allege a Plausible Aiding-and-Abetting Claim (Count 3).**

The district court also properly dismissed Count 3, which alleges Starbucks "has, is, or will" aid or abet the commission of MHRA violations. Jt.App.57-58, R.Doc.1, 50-51 ¶¶294-301; §213.070.1(1), RSMo. As discussed, the MHRA does not authorize the Attorney General to assert any of the MHRA claims in the Complaint, including Count 3. But even beyond that, the Attorney General has not alleged facts that could state an aiding-and-abetting claim.

*First*, the Complaint does not allege any actual or threatened conduct, taken by any person, that would violate the MHRA. Thus, the Attorney General has failed to establish a necessary predicate to pleading an "aiding-and-abetting claim"—non-conclusory allegations that some "other" person's conduct that was aided or incited by Starbucks (or attempted to be aided or incited by Starbucks) violated the statute. *See Matthews v. Harley-Davidson,* 685 S.W.3d 360, 369 (Mo. 2024) (an employer

---

[20] *See also Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1296 (9th Cir. 2000) (fact that affirmative action plan existed is not relevant to proving discrimination); *Musa v. Soar Corp.*, 2014 WL 6809019, *7 (E.D. Pa. Dec. 1, 2014) (same regarding diversity initiatives); *Reed v. Agilent Tech., Inc.*, 174 F. Supp. 2d 176, 185 (D. Del. 2001) (same).

is liable under the MHRA for aiding and abetting when it "'knows that [an]other's conduct" violates the MHRA and "gives substantial assistance or encouragement to the other'" (emphasis added) (quotation omitted)).

But even beyond that, the Attorney General has not pled facts establishing Starbucks provided substantial assistance or encouragement to "another." *Id.*; Restatement §876(b). The Complaint only makes allegations concerning Starbucks' conduct. The Attorney General argues Starbucks can be liable under this provision for aiding and abetting, or attempting to aid and abet, its own employees. The conduct of Starbucks' employees, however, is the conduct of Starbucks, itself. *Sherrer v. Boston Sci. Corp.*, 609 S.W.3d 697, 706 (Mo. 2020) ("A corporation, being an artificial person ..., can act only through its officers, directors and agents." (citation omitted)); *8000 Maryland, LLC v. Huntleigh Fin. Servs.*, 292 S.W.3d 439, 452 (Mo. App. 2009) ("[A] corporation cannot conspire with its own employees" because "'[t]wo entities that are not legally distinct cannot conspire with one another.'" (citation omitted)).

The district court's holding rested on this straightforward proposition—one cannot aid and abet oneself, and a company's alleged conduct with respect to its own employees cannot establish an aiding-and-abetting claim. Add. at 43, Jt.App.1679, R.Doc.40, 43. The court distinguished the Attorney General's sole case cited in support, *Matthews*, because that case involved "two joint employing entities that

encouraged and assisted the other in committing or covering up unlawful discrimination among their shared workforce." The court did not, as the Attorney General suggests, read *Matthews* as holding an employer cannot aid or abet its own employees—this question was not expressly raised or answered in *Matthews*, and nothing in the district court's Order suggests otherwise. But the court's conclusion is supported by multiple persuasive authorities directly addressing this and analogous issues. *Radford v. Potosi R-III Sch. Dist.*, 2024 WL 1178000, at *8 (E.D. Mo. Mar. 19, 2024) (dismissing aiding-and-abetting claim against school district based on conduct of Assistant Superintendent, explaining, "[o]ne cannot aid and abet oneself under the MHRA"); *Glore v. Potosi R-III Sch. Dist.*, 722 F. Supp. 3d 950, 958 (E.D. Mo. 2024) (similar); *8000 Maryland*, 292 S.W.3d at 452.

The fact that the MHRA also prohibits an employer from "attempt[ing]" to "incite" or "compel" discrimination does not change the analysis. Just as one cannot aid and abet oneself, or conspire with oneself, one cannot incite or compel oneself to engage in conduct, or attempt to do so. If a company's employees discriminate in violation of the MHRA, or assist other employees of the same company in doing so, a proper plaintiff can allege a direct violation of the MHRA against the company. But a plaintiff cannot seek to hold the company, as the sole defendant and principal of its employees, liable for aiding or abetting the conduct of its own agents.

**D. The Attorney General Has Not Alleged an Unlawful Training Program. (Counts 4 and 5).**

The district court properly dismissed the unlawful-training-program claims in Counts 4 and 5 because the court recognized the challenged mentorship program is now open to all employees. The Attorney General does not argue the district court misread the document supporting this conclusion—Starbucks' 2024 Annual Report—or cite any authority suggesting the court was not permitted to consider it. She nonetheless argues her claim should survive because she chose not to allege this fact in the body of the Complaint. Aplt. Br. 68. As explained, the Attorney General is wrong, and the court properly considered descriptions of current policies and programs in the referenced documents when assessing the Attorney General's facial challenge.[21]

The Attorney General also argues her outdated description of the initial mentorship program can support a claim for damages, but this argument is irrelevant. The Attorney General proceeds only with facial challenges to Starbucks' policies, and the relief is necessarily prospective. *Ezell*, 651 F.3d at 698-99; *CMR D.N.*, 703 F.3d at 624.

### E. The Complaint Does Not State a Claim for Unlawful Segregation. (Counts 6 and 7).

---

[21] The Attorney General's argument that the court had to rely on her cherry-picked description from old documents and ignore the 2024 Annual Report is especially mistaken where only Starbucks' current policies are relevant to the Attorney General's facial challenge. Jt.App.41, R.Doc.1, 34 ¶¶189-93 (relying on 2021 Proxy).

The district court also dismissed the claims for unlawful segregation because the court recognized Starbucks' Partner Networks are "open to all employees regardless of protected class," as described in the documents cited and quoted within the body of the Complaint. Add. at 42, Jt.App.1678, R.Doc.40, 42; Jt.App.47, R.Doc.1, 40 ¶¶224-25 (alleging Starbucks has stated all partners are permitted and encouraged to participate in Partner Networks). The Attorney General argues the court should not have relied on this statement because the Complaint also alleges, "on information and belief, Starbucks' claims are merely pretext to cover up its unlawfully discriminatory intentions." Jt.App.47, R.Doc.1, 40 ¶226. The court need not defer to the Attorney General's conclusory allegation of pretext, but, regardless, the assertion is irrelevant to the Attorney General's facial challenges. Such claims focus entirely on the face of Starbucks' policies rather than Starbucks' intent with respect to any particular employment action. *W. Easton Two, LP v. Borough Council of W. Easton*, 489 F. Supp. 3d 333, 356 (E.D. Pa. 2020) ("When considering a facial challenge, intent is irrelevant." (citation omitted)).

The Attorney General also argues the court erred in holding the Complaint fails to allege the requisite harm from any Partner Network. 42 U.S.C. §2000e-2(a)(2); §213.055.1(1)(b), RSMo.[22] The Attorney General seemingly does not

_____

[22] The district court did not actually reach a conclusion on this question. Add. at 42, Jt.App.1678, R.Doc.40, 42.

dispute the requirement to show harm, but she argues the Partner Networks <u>do</u> harm employees by "facially classify[ing] employees based on race" and having "representatives from each Partner Network speak to the companies' leadership on behalf of all employees possessing that protected trait." Aplt. Br. 63-64.

The cited documents and Complaint allegations do not support this characterization, as the Complaint never alleges representatives of Partner Networks speak with leadership on behalf of anyone. Instead, the Complaint alleges only that leaders of Partner Networks met quarterly at roundtables with Starbucks' CEO, and that the Partner Networks "serve as liaisons between leadership and the rank-and-file." Jt.App.45; R.Doc.1, 38 ¶¶211, 213. The Complaint does not allege any further facts regarding the roundtables or liaison role.

Regardless, under *Muldrow*, facial classification cannot state a claim without showing actual harm to the terms or conditions of employment. 601 U.S. at 354-55; *EEOC v AutoZone, Inc.*, 860 F.3d 564, 568-69 (7th Cir. 2017) (unlawful classification-or-segregation claim requires showing of some actual harm to terms and conditions of employment). The Attorney General does not explain how providing an opportunity for representatives from voluntary employee organizations to speak with leadership impacts any identifiable term or condition of employment.

Counts 6 and 7 cannot state a plausible claim for relief.

# CONCLUSION

For the reasons stated, Starbucks respectfully requests this Court affirm the district court's dismissal of the Attorney General's Complaint under Rules 12(b)(1) and (6).

Dated: June 17, 2026

Respectfully submitted,

**Dowd Bennett LLP**

/s/ *James F. Bennett*
James F. Bennett, 46826MO
jbennett@dowdbennett.com
7676 Forsyth Blvd., Suite 1900
St. Louis, Missouri 63105
(314) 889-7300 (telephone)
(314) 863-2111 (facsimile)

**Orrick, Herrington & Sutcliffe LLP**

Esther G. Lander
elander@orrick.com
2100 Pennsylvania Ave., NW
Washington, DC  20037
(202) 339-8529 (telephone)
elander@orrick.com

*Counsel for Appellee Starbucks Corp.*

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a). This brief contains 12,912 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). This brief has been prepared in a proportionally spaced typeface using Microsoft 365 in fourteen (14) point Times New Roman font.

Dated:   June 17, 2026

*/s/ James F. Bennett*
James F. Bennett
Attorney for Appellee

# CIRCUIT RULE 28A(h) CERTIFICATION

The undersigned hereby certifies that I have filed electronically, pursuant to Circuit Rule 28A(h), a version of the brief in non-scanned PDF format.  I hereby certify that the file has been scanned for viruses and that it is virus-free.

*/s/ James F. Bennett*
James F. Bennett

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on June 17, 2026, an electronic copy of the Appellee's Brief was filed with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. The undersigned also certifies that all participants in this case are registered CM/ECF users and that service of the Brief will be accomplished by the CM/ECF system.

Dated: June 17, 2026

/s/ James F. Bennett
James F. Bennett